### B. F. COLLINS v. VIRGINIA POWER AND ELECTRIC COMPANY.

(Filed 8 March, 1933.)

1. **Contracts A e: Electricity A a—Contract limiting liability for negligence in furnishing electricity held void as against public policy.**

    A public-service corporation maintained a primary wire charged with a deadly current of electricity along a highway from which secondary wires led across plaintiff's premises to his warehouse, all of which electrical equipment was furnished and installed by and was under the sole control and inspection of the electric company: *Held,* the electric company's written contract with the owner of the warehouse that it would not be liable for damages which might occur on his property from electricity is void, such contract being against public policy as relieving the electric company of negligence in respect to its duties to properly install, maintain and inspect its equipment.

2. **Electricity A a: Negligence A e—Doctrine of res ipsa loquitur held to apply to fire originating at electric fixture.**

    In an action for damages against an electric power company, evidence tending to show that plaintiff's warehouse caught fire at the point where defendant's wire was attached to the warehouse by a bracket, and that the wires, poles, bracket and other electrical equipment were installed and maintained by the power company and were under its exclusive control and inspection is sufficient to be submitted to the jury under the doctrine of *res ipsa loquitur.*

3. **Trial E g—**

    The charge to the jury will be construed as a whole, and where it is free from error upon such construction an exception thereto will not be sustained.

4. **Electricity A a—**

    The charge in this case, when construed as a whole, correctly instructed the jury that they must find that the fire originated at defendant's electrical fixture before they could apply the doctrine of *res ipsa loquitur.*

APPEAL by defendant from *Moore, Special Judge,* and a jury, at October Special Term, 1932, of HALIFAX. No error.

This is an action for actionable negligence brought by plaintiff against defendant alleging damage. The evidence of plaintiff was to the effect

that on 2 May, 1932, he owned a warehouse, frame wooden building, the market value of which was $1,100, with a stock of merchandise in it, the market value of $400. The defendant is a public-service corporation furnishing electric power and lights. Its name indicates what it is— "Power and Electric Company." It had a primary service-current line on poles which carried 6,600 voltage running along State Highway No. 40. A secondary three-wire service line transmitted or conducted the current from one of its primary poles, which had a transformer to a pole within some 30 or 40 feet of plaintiff's warehouse frame wooden building. A metal bracket was attached to the southwest corner of the warehouse, about 15 feet from the ground, the bracket was not over 2 feet from the eaves of the southwest corner of the west side. The wires, bracket, equipment, appliances, installation, insulation of wires, material, maintenance, inspection, etc., were all done and furnished by defendant on plaintiff's premises.

O. S. Dickinson, a witness for plaintiff, who had been working for plaintiff about 20 years, testified in part: That on 2 May, 1932, he was sleeping in a room in the brick building of plaintiff, next to the warehouse, he was awakened—the window he looked out was about 20 feet from the bracket: "When I woke up I jumped up and ran to the window so I could look out and see the fire. When I looked out the window *I saw the corner of the warehouse on fire where the wires came to the warehouse.* That was the southwest corner of the warehouse. The metal bracket which has been described was not over two feet from the eaves of the southwest corner, on the west side, right on the corner, as close as it could get to it, next to the store building. When I looked out of the window and saw the fire there was not a very large area burning at that time. I don't think there was over three feet. It was not over three feet from the corner. I could see the eaves just were catching a little, weather-boarding catching up this way and whether it was catching on the south side I don't know because I could not see on that side. No fire whatever on the top of the building. *The fire was right along the metal bracket. When I looked out and saw the fire burning around the metal bracket.*" Dickinson dressed and went to the warehouse. "I took my keys and opened the warehouse and got up in the warehouse and not a spark of fire in there, just smoke at the corner where the fire was coming through the crack. No fire in the inside of the warehouse, the fire *was right on that corner where the bracket was.* . . . After I came from the inside of the warehouse I went to the place where the fire was burning. Went down to the corner of the warehouse. *I saw the fire burning around the bracket and of course it was getting larger and larger.* . . . As the fire burned the wires soon fell down in the water. I could see it popping and blue fires. Q. When the wires

fell into the water what happened to the wires? A. They were popping and shooting. Q. What happened to the wires as they fell into the water or after they fell into the water? A. They were popping and you could see blue blazes flying from them. . . . *I would say the wires sputtered in the water five minutes before they stopped.* I didn't notice particular. I don't know that they sputtered five minutes. I don't think it was over that. Might have been five minutes or a little longer. I don't know how the current was finally cut off of the wires. . . . About twenty feet from the window. That was the closest window. That is the window I looked out of, the south window. When I jumped up out of bed I rushed straight to that window. They were standing under that window calling me, on the side of the building. *It is not over twenty-five feet from the rear window to that metal bracket.* I should not think it is over twenty-five feet from the window on the rear to the metal bracket on the end of that warehouse. . . . I went upstairs at nine o'clock that night and went right to bed. This fire occurred somewhere between ten-thirty and eleven o'clock. I don't know exactly."

William W. Johnson, a witness for plaintiff testified in part: "I was in Weldon on the night of 2 May, 1932, and saw the fire at Collins' warehouse. . . . When I got there the fire was on the corner of the warehouse about fifteen feet from the ground, burning in a circle that you could put your arm around. *The wires went directly into the circle of this fire,* the wires coming from a pole went in and you could see the wires coming out to go to the brick store building, came out from it. The wires came from a pole, I guess to be around thirty or forty feet from the corner of that warehouse. They were light wires, black wires. . . . The fire was on the corner this was approximately a foot, the flame just touching the tip, place it projects over, I wouldn't say a foot but the flame running up to the edge of the roof. The flames were in about a foot of the roof and the center of the fire was a foot or eighteen inches down, *after I saw the fire up there where the wires went into the center of it.* . . . He unlocked the warehouse door and I went in the warehouse with him. . . . I had observed the fire on the outside. I saw the wires fall. When they burned loose at the top they fell out, kinder pulled away from the building and fell out towards, formed more or less, a straight line from the pole to the store. They fell to the west, away from the side of the building. *They fell on the ground. After they fell on the ground they sputtered for probably a minute to two minutes.* The garden hose had been turned out there and the ground was wet and when they hit the ground they arced up and burned in two, insulation burned right off of them. . . . *I said when I got to the building there was burning up in the neighbor-*

*hood of the bracket* and there was a circular area of fire that you could reach your arm around like this, I could not say how much below the bracket was burning because I didn't see the bracket. *I could see the wires coming in. It was not over eight inches below the lowest wire that was burning* but I didn't see any bracket at all. *I would say it was burning a foot to fifteen inches above the bracket."*

H. R. Hargrove, witness for plaintiff, testified in part: "On the night of 2 May, 1932, I was in my store. I saw this fire which it is alleged occurred on that night. I got there somewhere between ten-thirty and ten forty-five. . . . *There was a metal bracket on the warehouse, with three wires connected to that metal bracket.* The wires led from the pole on the street, thirty or thirty-five feet. Those wires were used to run current in the Roanoke Supply Company. *The fire was around the metal bracket on the warehouse. The center of the fire was at the metal bracket on the warehouse, best I could see it.* I imagine this metal bracket was located about a foot, might be more, from the roof. Might be less. When I first got there the flames had not reached the roof. . . . *The wires fell down and sputtered and arced a minute or two.* The current was finally cut off, the wire was cut in two. I don't know who cut the wire."

There was other evidence on the part of plaintiff corroborating the above named witnesses. The plaintiff introduced two witnesses whom the court below found were experts. The first, in answer to a hypothetical question, propounded by plaintiff, testified: "Q. Do you have an opinion as to what was the cause of the fire? A. Yes, sir. Q. What is that opinion? A. It was set afire from the wires in my opinion." The second, in answer to a hypothetical question, testified: "Q. Do you have an opinion as to what was the cause of the fire? A. Yes, sir, I should say it can be caused by arcing on that bracket."

The defendant denied negligence and introduced witnesses to the effect that the fire did not start as contended for by plaintiff's witnesses at the bracket, but elsewhere. That the wires, bracket, etc., were properly installed, insulated and inspected.

J. H. Cranwell, a witness for defendant, testified in part: "I am employed by the Virginia Electric and Power Company, I have been with the company a long time, probably twenty some years, twenty-three or four years. I live in Roanoke Rapids. I am supposed to be service man with the company, meter reader, looking after service. *In looking after service it is my duty to inspect service and see that the appliances are all right. That is part of my job to inspect the service and see that they are kept in good condition. I inspected the service into the premises of Mr. Collins, where the fire occurred, every month;* around the 12th or 13th of each month passed there and read the meters, always inspected

the service when convenient for me to do it. The last time I inspected that service was the 13th or 14th of April, which would be less than thirty days before the fire. That record was not in writing. I inspected the wire that came from the transformer to the corner of the building and from the corner to the back end of the brick store building. The wires were in good condition, bracket and spools and all in good condition."

The defendant introduced several experts who testified contrary to plaintiff's experts.

N. E. Cannada, an expert witness for defendant, testified in part: "I am an electrical engineer. Studied electrical engineering at school. I am State electrical engineer and inspector. I have charge of inspection of all electrical wires in the State for the protection of life and property. I examine the cause of electrical fires. I have heard the testimony in this case. I have heard the hypothetical question read and I understand it. In the light of that question, in the light of the evidence and facts and circumstances in evidence in this case in my opinion *it is possible that the fire there could have been caused by electric current at the rack at the southwest corner of the wooden building that burned on 2nd of May*. I do not think it could have been an electric fire because it would have been impossible for the amount of current that it would have taken to heat up that rack of that size for the heat to have set fire to wood. I don't know and I could not answer if it would have been possible to have had a short circuit or arc which might have caused a spark or sputter that would have set that building on fire, I would say I do not know what material was in and around the rack. The testimony is it was ordinary wood. I do not think a spark or short circuit could have set it on fire. An arc would not set a flat piece of board on fire because not long enough duration to heat the wood at the temperature to cause a blaze. I am familiar with the up-to-date, first-class operating equipment in the way of wires, fuses, transformers, insulation over wires, racks, spools used by electric utility companies in the State of North Carolina. The equipment used by this company that is shown in evidence is first-class operating up-to-date equipment. The method of business of this company, so far as disclosed, is first-class operating practice in the State of North Carolina. (Cross-examination.) If those wires were up against a wooden building that would be different. That would be a different thing. I am predicating my testimony on the fact that those wires didn't come in contact with the wooden building."

Defendant set up the further defense: "That, on 16 September, 1927, plaintiff made and entered into a contract and agreement with defendant company, by the terms of which defendant company was to furnish to plaintiff, for the price fixed in said contract, electric service at its plant

or plants in South Weldon, North Carolina. . . . . That, among the terms and conditions of the rules and regulations endorsed on the back of said agreement, there appear the following, to wit:

(a) '1. The Virginia Electric and Power Company (hereafter called the company) will furnish the meter and the service appliances up to the nearest convenient point on the property line or building line of the customer necessary to connect the customer's equipment with the mains of the company. The wiring, equipment and appliances from the customer's property, shall, except as stated above, be furnished by the customer, who shall be responsible for the installation, maintenance, condition and use thereof.'

(b) '9. The electric current supplied under this contract is supplied by the company and purchased by the customer upon the express agreement that—the company shall not, in any event, be liable—for any loss or damage resulting from the presence, character, or condition of the wires or appliances of the customer, or for any loss or damage by reason of the construction, maintenance or use of the intermediate service line from the entrance upon the customer's property to the meter.'

(c) '13. The company assumes no obligation or liability for or on account of any condition on the customer's premises or for any defects in the customer's wiring or appliances, or for the inspection or repairs thereof.'

The defendant expressly pleads the terms and conditions, appearing on the back of said contract and agreement, and especially those set out above, in bar of plaintiff's right to recover."

The issues submitted to the jury and their answers thereto, were as follows:

"1. Was the warehouse and property of the plaintiff burned and destroyed by the negligence of the defendant as alleged in the complaint? Answer: Yes.

2. What damage, if any, is plaintiff entitled to recover of the defendant? Answer: $1,200."

The court below rendered judgment on the verdict. The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The necessary facts, material exceptions and assignments of error will be set forth in the opinion.

*Julian R. Allsbrook and Dunn & Johnson for plaintiff.*

*J. Justin Moore, Archibald G. Robertson, Geo. C. Green and Spruill & Spruill for defendant.*

CLARKSON, J. Most of defendant's exceptions and assignments of error were abandoned. Rules of Practice in the Supreme Court of North Carolina, 200 N. C., p. 831, part of Rule 28.

The defendant in its brief sets forth the following questions involved for our decision:

(1) Is the plaintiff barred of recovery by the provisions of the agreement between him and defendant company, dated 16 September, 1927? We think not.

(2) Did the court err in submitting to the jury the question of whether or not the *res ipsa loquitur* rule applies in this case, and in its instructions to the jury thereon? We think, taking the charge as a whole, there was no prejudicial or reversible error.

(3) Was there error in the court's instruction to the jury on the issue of damages? On the argument it was stated by counsel for defendant that if the court decided the other questions against defendant, the error which the defendant complained of would not be pressed.

The defendant is a public-service corporation. It is given the extraordinary power and authority to take the private property of individuals or corporations, upon payment of a just compensation necessary for its public purposes. Also certain rights over State Highways, etc. C. S., 1705, 1706, 1695, 1696, 7525. For the benefits it assumes the burdens. It cannot contract against its negligence when discharging its primary duty to the public. Any other holding would put the individual or corporation using and paying for its power at the mercy of the public-service corporation.

In *Slocumb v. R. R.,* 165 N. C., at p. 343, the principle is well stated, citing numerous authorities: "It is well settled here and elsewhere that a common carrier while performing its duties to the public cannot contract against its negligence; but the public had no interest in the plant of the plaintiff or in the lease between him and the defendant, and the authorities seem to be uniform that such contracts are not against public policy and are enforceable."

*Singleton v. R. R.,* 203 N. C., 462, is distinguishable from the present case: (Headnote) "The rule that a common carrier may not contract against liability for its negligence applies to transactions in the performance of its duties to the public as a common carrier and not to transactions involving no public duty or obligation."

In Cooley on Torts, Vol. 3 (4th ed.), chap. 21, part sec. 494, at p. 449, it is said: "But there may be contracts which, perhaps, public policy would forbid. This has been held to be the case with the contracts of common carriers which assume to exempt them, not only from liability for the inevitable risks attendant upon their business, but for risks from the negligence of themselves and their servants. In numerous cases it has been held that they could not by any stipulation relieve themselves from responsibility for injuries resulting from a want of ordinary care. . . . (part sec. 496, pp. 460-61) The cases of car-

riers and telegraph companies have been specifically mentioned, because it is chiefly in these cases that such contracts are met with. But although the reasons which forbid such contracts have special force in the business of carrying persons and goods, and of sending messages, they apply universally, and should be held to defeat all contracts by which a party undertakes to put another at the mercy of his own faulty conduct." 6 R. C. L., sec. 132, at p. 727-8.

The evidence in the present case is to the effect that defendant had placed a bracket on the warehouse, wooden frame building, run the wires from the primary current and had complete and sole control of the set-up and current. The wires, bracket, equipment, appliances, installation, insulation of wires, material, maintenance and inspection were all done and furnished by defendant on plaintiff's premises. Defendant's witness, J. H. Cranwell, testified, in part: "In looking after service it is my duty to inspect service and see that the appliances are all right. That is part of my job to inspect the service and see that they are kept in good condition. I inspected the service into the premises of Mr. Collins, where the fire occurred, every month." In fact, after the fire, defendant removed the wires.

Under the facts and circumstances of this case, the position contended for by defendant cannot be sustained—the contract is against public policy, null and void, and of no avail as a defense to this action. Any other holding would limit and endanger the use in the homes and elsewhere of electric power; and this beneficent, modern convenience seriously handicapped, as users know practically nothing about this invisible, subtle and dangerous force. *McAllister v. Prior,* 187 N. C., at p. 855-6.

The next contention of defendant is in regard to the charge of the court below on the aspect of *res ipsa liquitur.* This Court has recently written on the subject now debated, in *Lynch v. Tel. & Tel. Co., ante,* 252, quoting from Jones Telegraph and Telephone Companies (2d ed.), part sec. 198, at p. 225: "Furthermore, where so dangerous an agency as electricity is undertaken to be delivered into houses by electrical companies for daily use, very great care and caution should be observed, and such a degree thereof as is commensurate with the danger involved, and which is enhanced by the lack of the consumer's knowledge of the safety of the means and appliances employed to effect the delivery. It is generally held that in case of injuries sustained from electric appliances on private property the doctrine of *res ipsa loquitur* applies where it is shown that all the appliances for generating and delivering the electric current are under the control of the person or company furnishing the same."

Now, in the present case it was shown by plaintiff, and not seriously denied by defendant, that as before stated, the wires, bracket, etc., on

plaintiff's premises were all furnished and installed, inspected, etc., by defendant. It has sole control and responsibility. In terse and correct language defendant says: "The one acute question was, 'What caused the fire producing the injury?' and, upon that question not only was the factual evidence of plaintiff's and defendant's witnesses conflicting, but the expert evidence was equally so."

The charge of the court below must be construed as a whole, not disconnectedly or disjointedly. From a careful reading of the charge of the court below, it gives clearly and fairly the contentions of the litigants on both sides, and the law applicable to the facts. The only exception and assignments of error (the damages one abandoned), is the one we are now considering hereinafter set forth. The court below, before it set forth the *res ipsa loquitur* attitude, gave these contentions and charged as follows: "Plaintiff offered evidence tending to show that there were a number of witnesses who saw the fire when it was first discovered and that it was around the bracket a foot and a half or twelve inches from it; fire in foot or foot and a half of the eaves of the house. . . . On the other hand, defendant contends you ought not to be so satisfied first, that the fire was on this warehouse as the plaintiff contends that it was in the beginning, and second, that even if it was that it was due to some other cause than the electrical energy it was supplying and that you should answer this issue 'No.' I charge you, gentlemen, in this case if the plaintiff recover at all he must recover on negligence as alleged in the complaint. He contends it was due to the negligent manner in which the defendant permitted its apparatus to become in or be in and that it was negligent in that and that due to that negligence this building was burned and his property destroyed, that you should find one of these facts from this evidence and by its greater weight. On the other hand, defendant contends, that you ought not to be so satisfied, either that the fire was occasioned at this particular place where the bracket was located or if you should be so satisfied of that that you ought not to be satisfied by the greater weight of the evidence that the electrical energy coming over No. 6 wire be of sufficient intensity to occasion the burning of this building."

The contentions and charge deal with the disputed fact of the origin of the fire between the plaintiff and defendant. As this fact was disputed on this attitude the jury had to determine same. The court below later charged the jury: "I charge you, therefore, that when the thing which causes an injury is shown to be under the management of the defendant and the happening is such as in the ordinary course of things does not happen, if those who have the management of the instrumentalities use proper care in the absence of explanation by the defendant, it constitutes some evidence that the accident arose from the want of care. The occurrence or injury may, in connection with other circumstances,

sufficiently show negligence as to justify judgment where the thing causing the injury is under the management of the defendant and the accident is such that in the ordinary course of things does not happen if ordinary care is used." If the facts were as contended by plaintiff as to the origin of the fire, it is intimated in the above charge that the rule of *res ipsa loquitur* applied. It is the duty of this Court to reconcile the charge if possible and for this purpose consider it as a whole. This aspect of the charge would, with the above contentions and charge, and taking all the contentions and charge as a whole into consideration, indicate that if the jury, by the greater weight of the evidence, reached the conclusion in their deliberations that the fire started at the bracket, then the principle of *res ipsa loquitur* would apply. It is only where there is a material and irreconcilable conflict that a new trial is ordinarily awarded.

Taking the charge as a whole, we see no prejudicial or reversible error. In the judgment below we find

No error.