**OKLAHOMA NATURAL GAS CO.**

v.

**APPEL (three cases).**

No. 35456.

Supreme Court of Oklahoma.

Nov. 17, 1953.

Rehearing Denied Jan. 19, 1954.

Application for Leave to File Second Petition for Rehearing Denied Feb. 9, 1954.

Pinson, Lupardus & Carlson, Tulsa, for plaintiff in error.

Gomer Smith & Associates, Oklahoma City, for defendants in error.

O'NEAL, Justice.

The record before us presents two pivotal questions; namely, does the proof support the allegations of negligence and causal connection as set out in the petition, and are the amounts of the verdicts sustained by the evidence.

Laura Appel, Barbara Sue Appel, an infant, by her father and next friend, and Charles F. Appel, filed three separate suits against the Oklahoma Natural Gas Company, a corporation, alleging that each plaintiff suffered damages, either in person or property, resulting from a gas explosion in their home on January 5, 1948. As the separate petitions are identical in form and substance, other than the monetary relief prayed for, and as the three cases were consolidated for trial, separate verdicts rendered, and separate judgments entered thereon, our reference to the pleadings, nature of the actions and conclusions as to the probative value of the evidence to support the verdicts will generally be applicable to each case.

Shortly after the plaintiffs moved into their home in September, 1947, the odor of natural gas became noticeable throughout several rooms of the house. On several occasions in November and December, 1947, plaintiffs notified the defendant, Oklahoma Natural Gas Co., of gas odors and requested it to send out its service agent to examine the house for leaks in lines and valves. After defendant's servicemen made their investigation they advised plaintiffs that "everything was alright."

On January 5, 1948, there was an explosion resulting in physical injuries to Mrs. Appel and her daughter, Barbara Sue. The plaintiff, Charles F. Appel, and their minor son, were not at home when the explosion occurred.

The separate petitions substantially allege that the plaintiffs' residence was serviced by the defendant company, and that in the performance of said services the defendant had negligently permitted gas to escape from connections in the house for some time prior to their occupancy thereof, which fact was not known to the plaintiffs, but was known to the defendant as the previous occupants of the house had made numerous complaints of escaping gas to the defendant company.

Negligence is predicated upon an allegation that after defendant was advised of the gas leaks it failed to turn off the gas until necessary repairs could be made, or that it failed to discover that the gas was leaking and carelessly and negligently permitted the gas to flow into and through its lines, or the gas connections in the house, causing an excess accumulation of gas and the resulting explosion; that the defendant failed to advise or inform plaintiffs of the danger incident to the escaping gas in the house.

Defendant answered by way of a general denial and further pleaded the terms of its service contract as it applied to lines and the connections within the house. Defendant contended below and here that there is no evidence reasonably tending to support or establish plaintiff's causes of action and that the court erred in overruling defendant's demurrer to plaintiffs' evidence as well as denying its motion for a directed verdict. Other alleged errors are subsidiary and will be noted in our analysis of the evidence.

The residence occupied by the plaintiffs was constructed in 1945, and occupied by the builder and owner until September, 1947. During this period the then occupant notified the gas company on numerous occasions that gas was escaping in the house. After an examination of the house and premises, the gas company advised the occupant that everything was alright. The owner's evidence in this respect is corroborated by his wife and son.

The plaintiffs moved into the house in September, 1947, and shortly thereafter detected the odor of gas in several rooms of the house and on two occasions, both in the month of November and December, 1947, plaintiffs notified defendant that gas was escaping in the house. On each occasion defendant's serviceman made an inspection and advised plaintiffs that everything was alright. The gas explosion occurred on January 5, 1948.

One of plaintiffs' neighbors testified that from September, 1947, to the date of the explosion, she had frequently visited the Appels' home, and on these occasions noted escaping gas in several rooms of the house.

Defendant contends that there is a failure of proof that the explosion resulted from escaping gas, either in its lines or the gas installations within the house. The record discloses that immediately after the explosion occurred, three members of the Oklahoma City Fire Department made an inspection of the house and an investigation of the cause of the explosion. Their testimony is to the effect that the partition walls between the living room and dining room were blown down; plaster on the kitchen ceiling was blown off; the roof of the house was raised from 12 to 18 inches; the south wall of the kitchen was blown out into the yard; some of the bricks were blown off of the outside walls of the house and several of the windows were blown out. They further stated that there was little fire resulting from the explosion, other than the burning of curtains in the kitchen. They found that the kitchen stove was not burning but the pilot light on the water heater and on the floor furnace was burning. These witnesses, after detailing their experiences covering a period of years with reference to gas explosions, stated that gas had a tendency to rise and would accumulate over long periods of time from small leaks; they would eventually fill the attic or walls of the house and that in their opinion the explosion resulted from such a gas accumulation.

Corroborating the foregoing evidence that the explosion resulted from leaking gas, M. A. Witte, Chief Engineer of the Oklahoma Testing Laboratories and a graduate in chemical engineering from the University of Oklahoma, in response to a hypothetical question expressed the opinion that the explosion was of natural gas, rather than some inflammable substance such as kerosene or something like that. He stated that natural gas had a tendency to accumulate over a long period of time in attics or walls of a house, especially where the attic or walls had a considerable amount of dead space where no air could circulate. He further testified that as there was very little fire resulting from the explosion it indicated that it was a natural gas explosion, rather than one from some other cause; that if gas escaped in the plaintiffs' kitchen 10 x 10 x 8, or in the walls of that room at the rate of one cubic foot per hour, that sufficient gas could accumulate to cause an explosion. He further stated that a burning pilot light would not ignite gas as it escaped in the air of the room until a sufficient quantity escaped to create an explosive mixture.

Further evidence submitted in chief by plaintiffs had reference to the burns or the

physical injuries of the plaintiffs, Laura and Barbara Sue Appel and the damages claimed by the plaintiff, Charles F. Appel, to which we will subsequently advert.

Defendant here contends that the trial court should have disregarded the evidence of the witness, Witte, which would necessitate sustaining the demurrer to the plaintiff's evidence. It is not contended that the witness, Witte, was not qualified to give expert testimony but it is asserted that the hypothetical question propounded did not give the witness the actual facts in evidence. Specifically, it is contended that the hypothetical question was based upon an assumption that natural gas had escaped almost continuously in the house from July, 1945, to January 5, 1948, which assumption defendant says is contrary to the evidence. We do not so agree.

L. M. Barrett, who built the house, testified that he and his wife had called the gas company numerous times about escaping gas during the years 1945 to 1947, and by numerous times he meant that they had called the company from ten to fifteen times. Moreover, the Appels testified that after they moved into the house in September, 1947, they smelled escaping gas and so notified defendant on two separate occasions in the months of November, and December, preceding the explosion in the following January.

 Under this record it became the duty of the defendant when notified of escaping gas in the house, to shut off the gas until the owner or occupants of the house located and repaired the leak; or the defendant could undertake to locate the leak and make the necessary repairs. As the defendant chose to do the latter, and whether in so doing it exercised that degree of care required of it, was a question for submission to the jury.

Defendant argues that if a gas explosion in fact occurred, that it was occasioned by the opening of valves of the kitchen stove permitting gas to escape into the kitchen for which defendant cannot be charged with negligence. To support its theory, defendant called as a witness, J. L. Baxter, who owned the property at the time of the explosion. The witness stated that no repairs were made after the explosion on either the lines or the gas appliances in the house. A month after the explosion a representative of the Gatewood Plumbing Company made a twenty-four hour pressure test and reported that he found no gas leaks. After the house was repaired the plaintiffs moved back into it in the latter part of February, 1948, and at that time they called a plumber to test the valves of the kitchen stove. This plumber testified that he found a small leak in one valve but that he did not smell gas in the house. At plaintiffs' request he made another inspection at a later time and found a small leak in the kitchen stove and at that time put in new valves. He stated that the small leaks of gas could have been easily detected by a serviceman and could have been easily repaired.

Defendant's employee, Mr. Mercer, who was in charge of groups of servicemen employed to check appliances, stated that he did not recall sending anyone out to the Appels' home prior to the explosion but that he did send a Mr. Knight out immediately after the explosion and assisted Knight in checking the service lines. Mr. Knight, the trouble shooter, testified that he first examined the gas meter and found it turned off. After he turned off all appliances in the house he made a meter check of the house lines and turned the gas back on and found there was approximately one cubic foot an hour of gas leakage through the stove valves.

Charles L. Nickolls, Professor in Chemical Engineering at Oklahoma A & M College, qualifying as an expert witness, testified that the explosive percentage of natural gas in air would run from 4 to 14 percent, and that a cubic foot an hour of escaping gas throughout a number of years would have to go into a room the size of the Appels' kitchen if hermetically sealed before it would create an explosion; however, he stated that from the testimony introduced and the photographic exhibits in the record showing the condition of the house after the explosion, it was reasonable to assume,

from a scientific standpoint, that there was a gas explosion, and that more than one cubic foot of gas an hour had escaped into the house.

■ As we view defendant's evidence in conjunction with plaintiffs' proof, we conclude that the trial court properly denied defendant's motion for an instructed verdict in its behalf.

Defendant here argues that it was prejudicial error to admit evidence of any smell of gas within the house prior to the occupancy thereof by the Appels in September, 1947. The argument is based upon the fact that when Mr. Appel requested the defendant to make a gas connection to the house he signed a statement which reads, in part, as follows:

"Applicant states and represents that the gas piping and appliances on the premises to be served are in safe and proper condition for use and will be so maintained by the applicant before utilization of gas supplied by the company."

■ A sufficient answer to that contention is that a public service corporation serving natural gas under its franchise cannot contract against its own negligence. Gulf, C. & S. F. Ry. Co. v. Anderson, 120 Okl. 60, 250 P. 500. Neither does the record disclose that the Appels had any knowledge that there was a gas leakage in the house prior to the commencement of their occupancy thereof in September, 1947, when the application for gas service was made. The then owner of the house, L. M. Barrett, testified that he did not advise the Appels of the previous escaping gas in the house.

■■ Defendant in the absence of notice or particular circumstances was not required to either inspect or maintain any appliances of the consumer. Price v. Mac-Thwaite Oil & Gas Co., 177 Okl. 495, 61 P.2d 177; Okmulgee Gas Co. v. Kelly, 105 Okl. 189, 232 P. 428. Where as here the defendant had actual notice of the gas leakage the law imposes a duty commensurate with the danger.

In Bellevue Gas & Oil Co. v. Carr, 61 Okl. 290, 161 P. 203, 206, this court quoted from Consolidated Gas Co. v. Connor, 114 Md. 140, 78. A. 725, 32 L.R.A.,N.S., 809, as follows:

"Gas being an extraordinarily dangerous element, an extraordinarily high degree of skill and care is exacted, and the rule of ordinary care with respect to its transmission is adjusted, in view of its known dangers and probable entailments, by a standard of care proportionate to the. probable dangers."

The following cases support the foregoing rule: Oklahoma Gas & Electric Co. v. Oklahoma Ry. Co., 77 Okl. 290, 188 P. 331; Julian v. Sinclair Oil & Gas Co., 168 Okl. 192, 32 P.2d 31; Oklahoma Natural Gas Co. v. Jopling, 121 Okl. 10, 247 P. 69 and Margay Oil Corporation v. Jamison, Adm'r, 177 Okl. 433, 59 P.2d 790.

In 38 C.J.S., Gas, § 42, at page 738, it is said:

"A gas company having knowledge that gas is escaping in a building occupied by one of its consumers is under a duty to shut off the gas supply until necessary repairs have been made, or to remedy the defect itself as quickly as is practicably possible, even though the defective pipe or apparatus does not belong to the company and is not in its charge or custody, and if the company sends an employee to ascertain the defect or the location of the leak and to make repairs, it will be liable for any injury resulting from the negligence of the employee."

■ This rule was applied in the case of Nonnamaker v. Kay County Gas Company, 123 Okl. 274, 253 P. 296, 297, wherein we held:

"It is the duty of a gas company, when it receives notice from one of its consumers that gas is escaping into the building, to exercise reasonable diligence to cut off the gas. It is the duty of the gas company to cause the gas to remain shut off until proper repairs are made in the pipes and fittings by the owner, or the gas company, if it be the duty of the latter to do so."

In the instant case the proof discloses that notice was given by Mr. Barrett to

the defendant company on ten to fifteen occasions, and notices were given by the Appels on four occasions with reference to escaping gas in the house. As to what investigation the defendant's servicemen made, is left to conjecture as these employees were not produced as witnesses. Significantly, defendant's employee, Knight, testified that immediately after the explosion he turned off the gas and found it was passing the meter at one cubic foot per hour.

Where there are conflicting theories as to the cause of an explosion, it is for the jury to adopt the theory which appears from the evidence adduced to be the most reasonable.

In Oklahoma Natural Gas Co. v. Jopling, supra, we said:

> "Where there is more than one theory as to the cause of gas being permitted to pass through a certain channel or opening in gas pipe connections, and the different theories are supported by circumstantial evidence, the jury may then adopt such theory as in their judgment is the more plausible, and which is reasonably supported by the evidence."

The principle of law there announced is supported in the opinion of this court in Pact Gas Co. v. Baker, 203 Okl. 124, 218 P.2d 912.

Lastly, defendant asserts that one of the vital issues in the case was whether defendant had notice of escaping gas in the house occupied by the Appels, and that the trial court did not submit that issue in its instructions.

Mr. Mercer, defendant's utilization foreman who had charge of the employees of the defendant, whose duty was to check appliances for leaks, was asked: "Now, do you have any record of leaks, or anything about any calls about leaks in that house?" To which the witness responded: "I don't recall sending anybody out there prior to the explosion." The answer of the witness was neither responsive or was it a categorical denial of plaintiffs' evidence that on numerous occasions notice was given the defendant company of escaping gas.

Instruction No. 12 advised the jury that where a distributor of gas to the public controls its own apparatus for cutting off the gas when notified that gas is escaping into a house, owes the duty to the occupants of said residence to exercise reasonable diligence to cut off the gas from said building.

Instruction No. 13 advised the jury that where notice is given of escaping gas in a house the gas company is under a duty to make proper inspection to determine whether or not any dangerous condition exists.

Defendant's contention that the instructions assume that the company had notice of the leak, and thereby invaded the province of the jury, is wholly without merit.

There remains the question as to whether or not the verdicts in their awards as personal injuries and other damages are supported by the evidence. Laura Appel sued for $35,000 as damages for personal injuries received in the explosion and recovered a verdict and judgment for $35,000. Their minor daughter, Barbara Sue, sued for personal injuries in the sum of $10,000 and recovered a judgment for $5,000. Charles F. Appel sued for property damages and recovered a judgment for $20,000.

In Denco Bus Lines, Inc., v. Hargis, 204 Okl. 339, 229 P.2d 560, 563, we held that the measure of damages for a tort is such amount as will compensate for all detriment proximately caused thereby. In the opinion this court said:

> "It is not our province to substitute our judgment for that of the jury in the exercise of its function as a fact-finding body, and we must consider the testimony most favorable to the plaintiff as establishing the facts bearing upon the question of whether or not the amount of the verdict was excessive. * * *"

Plaintiff's physician testified that he first treated Mrs. Appel shortly after she arrived at Mercy Hospital. He stated she suffered burns about the head, arms and

back, and that she had a mild shock. A hypodermic was administered to relieve her pain, and that thereafter a blood plasma was given. The burns on her face, neck and ears were first degree burns; the burns on her arms, back and upper part of her back were second degree burns and the burns extended over a fifth of her body surface. She remained in the hospital for eight days for treatment and her physician did not see her again until in April, 1948, and from an examination then made by him he found she had a small white scar above each eye brow; she had a mottled discolored area on the back of her left hand and upon her left forearm, with a lesser mottled condition on the right arm. That on her back there were two scars, one measuring 12 inches wide and 4 inches in length, and the other scar was nine inches wide and 2 inches in length, and the scars are partly discolored and are of a permanent nature. He also found a small scar on her left upper arm. He testified that plastic surgery was not recommended because there would not be enough advantage or gain to justify the procedure. Her physician did not treat Barbara Sue while she was at the hospital. Her physician, however, testified that he examined the child at his office a few days before the trial and found that she had a few discolored areas on her right leg, not deep and not adhered, and not over 2 inches in area, and that this scar is of a permanent nature.

The record does not disclose that any further medical testimony was introduced in behalf of either the plaintiffs, Mrs. Appel or her daughter, Barbara Sue, or by the defendant. Mrs. Appel in her own behalf testified that her burns were extremely painful and while in the hospital she could not sleep and was given sedatives and hypodermics frequently; that after she left the hospital she went to Corpus Christi, and for several weeks remained in the home of her brother-in-law, a physician, who treated her and the child for their burns. She stated that she could not expose her back to the sun as the burns would blister, and that any pressure upon her back caused her great pain; that if she scrapes her left arm against any object it readily bleeds. During the trial she removed her blouse and the jury was given an opportunity to observe the scars on her back and arms.

As to Barbara Sue's scars, Mrs. Appel testified that the scar was on the child's thigh and extended 2½ inches to 3 inches in diameter, and the scar there is lighter than the rest of her body. No medical testimony was introduced other than the statement of Mrs. Appel's physician that he observed the scar on Barbara Sue a few days before the trial.

Mr. Appel testified that prior to the explosion Mrs. Appel enjoyed excellent health, but that now she is nervous and depressed and refuses to go to parties or formal dances and is unable, without assistance, to perform her usual household duties.

Charles F. Appel introduced evidence that he suffered damages as follows:

(A) Expense of $500 to send his eleven year old son to a military academy.

(B) Approximately $400 for hotel bill during the time Mrs. Appel was absent, and the house was being repaired.

(C) $290 hospital bill from Mercy Hospital and doctor bills of $60.

(D) Airplane trip to send Mrs. Appel to Corpus Christi and return $100.

(E) Damage to the clothing and furnishings of the house $850 or a total of $2,200.

As heretofore indicated, Mr. Appel's recovery was for the sum of $20,000 so it must be assumed that the sum in excess of $2,200 was allowed by the jury for the loss of his wife's companionship and consortium.

As we view the record we have reached the conclusion that the judgment in favor of the plaintiff Laura Appel should be and it is hereby affirmed.

The judgment rendered in favor of Barbara Sue Appel, by her next friend, is affirmed subject to the following: That Barbara Sue Appel, by her next friend, shall remit within thirty days from the date of this opinion in the sum of $2,500, and should the remittitur not be made this cause

is reversed for a new trial as to Barbara Sue Appel.

 The judgment rendered in favor of Charles F. Appel is affirmed, subject to the following: That Charles F. Appel shall remit within thirty days from the date of this opinion in the sum of $7,500, and should the remittitur not be made this cause is reversed for a new trial as to Charles F. Appel.

HALLEY, C. J., concurs as to Barbara Sue Appel, and dissents as to amount of recovery of Charles F. Appel and Laura Appel.

JOHNSON, V. C. J., and WELCH, CORN, ARNOLD, WILLIAMS and BLACKBIRD, JJ., concur.