353 P.2d 62

**SOUTHWESTERN PUBLIC SERVICE COMPANY, a corporation, Plaintiff-Appellant,**

v.

**ARTESIA ALFALFA GROWERS' ASSO-CIATION, a cooperative association incorporated, Defendant-Appellee.**

No. 6631.

Supreme Court of New Mexico.

June 9, 1960.

Hervey, Dow & Hinkle, Roswell, for appellant.

W. M. Siegenthaler, Artesia, Brown & Brainerd, Roswell, for appellee.

CHAVEZ, Justice.

Plaintiff-appellant, Southwestern Public Service Company, a corporation, filed suit to recover for services furnished defendant-appellee, Artesia Alfalfa Growers' Association, a cooperative association incorporated. Appellee filed its answer and a counter-claim alleging that three of its motors were damaged sometime between January 9, 1957, to June 1, 1957, through the negligence of appellant, and that appellant is indebted to appellee.

Appellant filed a motion for summary judgment on its original complaint and

judgment was entered for appellant. Said judgment was paid and satisfied. Thereafter, the trial proceeded on appellee's counterclaim.

Appellant filed its answer to the counterclaim and the court, after hearing said cause, found the issues for appellee, made its findings of fact and conclusions of law and entered judgment for appellee. From said judgment, appellant, the original plaintiff, appeals.

Appellee is an incorporated cooperative marketing association located at Artesia, New Mexico. Appellant is a public service corporation maintaining its principal place of business at Roswell, New Mexico, and is engaged in the business of generating and transmission of electrical energy to the general public in and near Artesia, New Mexico.

Appellee, in 1957, owned and operated a feed processing mill at or near Artesia, New Mexico, which was equipped with numerous electrical appliances including three separate 200 H.P. 60 cycle electric motors which were specified by the manufacturer to be operated by three phase electrical energy of 2,300 volts.

Appellee, in its counterclaim, alleges that appellant owed the appellee a duty to furnish electrical energy, evenly balanced, and uniformly supplied in proper voltages in safe and convenient form in order to operate its equipment and appliances without danger to human life or property.

Appellee further alleged that between January 9, 1957, and June 1, 1957, appellant negligently failed to discharge such duty to appellee, and in violation of such duty negligently permitted the electrical energy to enter the premises in excessive, high, irregular, fluctuating and unbalanced voltages, and that appellant knew, or in the exercise of reasonable discretion, should have known that the energy then being supplied to appellee was not being delivered in a safe and convenient form, evenly balanced, and in a proper condition to be used safely in the operation of appellee's equipment and appliances. Appellee further alleged that by the exercise of proper diligence, appellant could have prevented the loss and damage complained of by proper installation and maintenance of its transmission lines and incidental equipment, which it negligently failed to do.

Appellee further alleged that as a direct and proximate result of the negligent acts and omissions on the part of the appellant, that three separate electric motors at the premises then owned by appellee between January 9, 1957 and June 1, 1957, were burned, the motor windings were destroyed and the appellee damaged in the amount of $5,735.41.

Appellant filed its answer denying the allegations of the counterclaim and in its

first affirmative defense alleged that there was in force and effect a written contract between appellant and appellee which saved the company harmless from injury and damage to person or property.

In its second affirmative defense, appellant alleged:

"2. That the laws of the State of New Mexico authorize the State of New Mexico Public Service Commission to prescribe reasonable and adequate service regulations and standards of service rendered or to be rendered by any utility.

"3. That the Public Service Commission of the State of New Mexico by a regularly adopted order (its General Order No. 2) has provided that utilities shall file rate schedules, and regulations setting forth among other things, the following:

" 'General Order No. 2

" 'Section 11:

" ' * * * Each rate schedule should include the following information and as nearly as possible in the order shown: * * *.

" 'Conditions: Briefly any general or special conditions, exceptions, limitations or other data, regarding the service or rate applicable to the schedule * * *.

" 'Section 12:

" '* * * The following subjects, and other subjects where necessary should be covered by rules and regulations included in the tariff schedules of all public utilities: * * *.

" 'Description of Service: Full description of character of service rendered and standards of service maintained * * *.' "

Appellant's rules numbered 6 and 13 filed and approved by the Public Service Commission, provide:

"6. Continuity of Service: Company will use reasonable diligence to supply steady and continuous service but will not guarantee the service against irregularities or interruptions. Company will not be liable to customer for any damages occasioned by irregularities or interruptions. * * *

"13. Customer's Installation: Customer's Responsibility: Customer shall assume all responsibility on Customer's side of Point of Delivery for service supplied or taken, as well as for the electrical installation, appliances and apparatus used in connection therewith, and shall save Company harmless from any and all claims for injury or damage to persons or property occasioned by or in any way resulting from such service, or the use thereof, on the Customer's side of Point of Delivery."

At the conclusion of the taking of testimony, but before the court had made formal

findings of fact and conclusions of law, and before the entry of judgment, appellee moved and the court permitted appellee to make a trial amendment, alleging as follows:

"4 (a). At all times material hereto the plaintiff and counter-defendant Southwestern Public Service Company owed a duty to its consumers including the defendant and counter-claimant, to furnish electrical energy evenly balanced and uniformly supplied in proper voltage in safe and convenient form in order that damage to appliances consuming such energy would not result.

"4 (b). That the plaintiff and counter-defendant negligently failed to provide electrical energy to the defendant and counter-claimant in the manner above alleged and that the damages incurred as alleged in paragraph 3 were solely and proximately caused by the negligence of the plaintiff and counter-defendant Southwestern Public Service Company, its agents, servants or employees."

The pertinent provisions of the contract dated September 26, 1952, provide as follows:

"2. The Company will at its own cost build and maintain facilities to serve the Customer's requirements of not less than 356 HP with three (3)

phase, sixty (60) cycle electrical energy at approximately 2400 volts. The electrical energy to be supplied hereunder shall be measured at approximately 2400 volts, by standard meter or meters as the Company may select for this purpose, all to be owned and installed by the Company.

"7. The Customer assumes the responsibility of the electric power and energy delivered hereunder after it leaves the Company's lines, and beyond the point of delivery of power and energy hereunder and hereby agrees to protect and save the Company harmless from injury and damage to person or property occasioned by such power and energy beyond the said point of delivery. Unless otherwise provided in this agreement said point of delivery shall be the meter terminals. The Company shall not be liable to the Customer, or any person, by reason of the failure to deliver electrical energy as a result of fire, breakdown, acts of God or any other conditions beyond the control of the Company. The Company does not guarantee that the supply of electrical energy will be free from temporary interruption, and any and all temporary interruptions shall not constitute a breach of this contract, and the Company shall not be liable to the Customer for damage resulting from such temporary interruption, but will use its

best efforts to restore the service as soon as is can reasonably do so."

The trial court made the following findings of fact:

"2. During the year 1957, and at all times material hereto, the defendant-counterclaimant owned and operated a feed processing mill at or near Artesia, Eddy County, New Mexico, which was equipped with numerous electrical appliances including three separate 200 H.P. 60 cycle electric motors which were specified by the manufacturer to be operated by 3 phase electrical energy of 2,300 volts.

"3. That during the year 1957, and at all times material hereto, the defendant-counterclaimant was purchasing electric energy from the plaintiff-counter-defendant under an electric service contract dated September 26, 1952, for operation of the numerous electric appliances incident to its feed processing mill.

"4. For a considerable period of time prior to January 22, 1957, the plaintiff-counter-defendant had permitted certain capacitors to remain in operation on the transmission line leading into the defendant-counterclaimant's mill which had short-circuited, thereby creating a grossly unbalanced voltage provided, and in addition, for a long period of time prior to June 6, 1957, the plaintiff-counter-defendant had permitted its electrical energy, at various times, to exceed the proper voltage and to operate the defendant-counterclaimant's motors at voltages greatly in excess of the manufacturer's recommendations.

"5. That on January 9, 1957, as the direct result of such excessive voltage and unbalanced current conditions theretofore existing, the windings in a 200 H.P. electric motor located in the suncured Alfalfa Mill were destroyed, taking such mill out of operation until such damaged motor could be replaced.

"6. That on May 31, 1957, as the direct result of excessive voltage conditions as well as unbalanced current which had previously resulted from short-circuited capacitors, the windings in a 200 h.p. motor installed in the dehydrator mill were destroyed and such mill was taken out of operation until a replacement could be installed.

\* \* \* \* \* \*

"9. That on numerous and frequent occasions prior to January 9, 1957, the defendant-counter-claimant, through its agents, servants and employees, had made numerous and frequent complaints and requests to the plaintiff-counter-defendant, its agents, servants and employees, that it make

a detailed investigation of the service then being furnished to determine if its energy was not being delivered in excessive voltage and unbalanced current conditions, and requested that certain testing equipment be installed to assist in making such determination, but that no such equipment was installed until on or about January 22, 1957. When it was discovered, as a result of such tests, that certain capacitors had been permitted to remain in a defective condition on transmission lines leading to the defendant-counter-claimant's premises and that the plaintiff-counter-defendant knew, or in the exercise of reasonable diligence should have known, of such defective equipment and that the damages sustained by the defendant-counter-claimant on January 9th, 1957, were the direct and proximate result of negligent failure on the part of the plaintiff-counter-defendant to correct such defective conditions.

"10. That although the replacement of the defective capacitors on or about January 22, 1957, corrected the pre-existing unbalanced condition, no further steps were taken by the plaintiff-counter-defendant to correct an existing condition whereby electric energy was being delivered to the defendant-counter-claimant's premises in voltages exceeding those reasonably necessary to operate the mill equipment until on or about June 17, 1957, at which time mechanical corrections were made by the plaintiff-counter-defendant in order to reduce its voltages but that the plaintiff-counter-defendant knew, or in the exercise of reasonable diligence should have known of such excessive voltage condition theretofore existing, and the damages sustained by the defendant-counter-claimant on May 31, 1957, were the direct and proximate result of the plaintiff-counter-defendant's negligent failure to correct such defective condition.

"11. That at all times prior to June 17, 1957, which are material hereto, the plaintiff-counter-defendant negligently furnished the defendant-counter-claimant electrical energy which was not adequate, efficient and reasonable and that such failure was the direct and proximate cause of the damage and loss to the defendant-counter-claimant as herein found."

The trial court, among others, made the following conclusions of law:

"2. That every public utility, including the plaintiff-counter-defendant, is required by statute to furnish adequate, efficient and reasonable service.

"3. That the defendant-counter-claimant should recover judgment of and from the plaintiff-counter-defendant on its counterclaim in the amount

of $3,410.77, together with all costs expended."

Appellant's main contentions are that the contract between the parties, as well as General Order No. 2 of the New Mexico Public Service Commission, provided that appellant would not be liable for irregularities beyond the point of delivery, which is fixed as the meter terminals, and therefore, is not liable; that there is no substantial evidence upon which the trial court could find that the voltage was excessive so as to be unreasonable; that the case was tried by appellee upon the theory that the appellant owed a duty to furnish appellee voltage in accordance with the rating of its motors (2300 volts), whereas appellant contends that the permissible variance or fluctuation in voltage should be based upon "approximately 2400 volts" as provided in the contract; that appellant was under a duty to furnish electrical energy to the appellee to meet the manufacturer's voltage specifications within reasonable tolerances of not to exceed 10% above or below such specifications; and that the amount of permissible variance is a matter which should first be determined by the New Mexico Public Service Commission; that the trial court had no jurisdiction to pass upon the question of whether or not the nature or character of the services rendered (alleged excessive voltage and unbalanced condition) was unreasonable; and that until the matter was first submitted to the commission for determination the trial court had no jurisdiction to proceed in regard thereto.

Appellant argues under point I that the court erred in failing to include in its decision appellant's findings of fact numbered 1 to 10, inclusive, as provided under Rule 52 (b) (5). Rules of the District Courts of the State of New Mexico, which provides:

"(5) All requested findings of fact and conclusions of law not included in the court's decision as herein provided, shall be by the court marked 'Refused', and shall be filed as a part of the record proper."

This question was properly disposed of by the trial court in the following conclusion of law:

"All Requested Findings of Fact and Conclusions of Law inconsistent herewith are hereby refused."

Edwards v. Peterson, 61 N.M. 104, 295 P.2d 858.

Appellant also urges that the trial court committed error in failing to adopt its requested findings of fact numbered 1 to 8, inclusive. All of said proposed findings are based upon the Electric Service Agreement of September 26, 1952, and General Order No. 2 of the New Mexico Public Service Commission. Evidence was ad-

duced which tended to prove that appellant had permitted certain of its equipment to operate in a defective condition and that appellee had made various complaints and requests for inspection and testing of its equipment by appellant prior to January 9, 1957, on which date one of appellee's motors was damaged. Another motor was damaged on May 31, 1957. There is evidence that appellant failed to inspect or correct the conditions which had been called to its attention until June, 1957. The court held that the appellant negligently failed to inspect or correct such conditions and that such negligence was the proximate cause of appellee's damages.

Appellant is a public utility engaged in generating, transmission and sale of electrical energy to the public, including appellee. Its duty was to furnish adequate, efficient and reasonable service. Sec. 68–6–2, N.M.S.A., 1953. That duty is imposed by law, separate and apart from any contractual obligation to its consumers, and entirely apart from any pertinent matters filed by appellant with the Public Service Commission of New Mexico.

Appellant relies on Smith v. Southern Union Gas Co., 58 N.M. 197, 269 P.2d 745, 747, which involved a question of alleged discrimination by a public utility. It was a case wherein the operator of a cafe and tourist court sought an injunction to prevent the turning off of gas at his place of business because of his refusal to pay. The cafe and tourist court operator claimed that he was paying more for gas than other customers of the utility in the same and similar circumstances, and he contended further that he should have been charged under a schedule which carried a lower rate instead of the higher rate schedule upon which he was charged. In short, the operator claimed that his business was improperly classified and was being discriminated against. This court held that the Public Utility Act requirement that administrative remedy be exhausted before resort is had to the courts is not repugnant to the constitutional provision granting general jurisdiction to the district courts, except where limited in the constitution. This court followed its policy that where a remedy had been provided before an administrative commission for one claiming discrimination, claimant must first exhaust his administrative remedy before resorting to the courts. Even this case, however, recognized the difference between individual rights and public rights, saying:

"* * * The individual's right not to be discriminated against is quite different from the public's right to be protected against exorbitant rates. The former is a legal right long recognized; the latter, a political right. * * *"

In the case before us, appellee claims negligence on the part of appellant. The Public Service Commission cannot absolve appellant for its negligence.

Appellant also directs our attention to the provisions of the rules which they filed and which were approved by the Public Service Commission of New Mexico, which said rules have been hereinbefore set out. If we apply the principle of law herein discussed, we cannot see how appellant can escape liability for its negligence by any rules filed with the Public Service Commission. Public utilities, under our statute, are affected with the public interest as set out in Sec. 68–3–1, N.M.S.A., 1953. Also see 73 C.J.S. Public Utilities § 39, p. 1071, and cases cited, wherein it is stated:

"The power of the commission does not extend to acts of a utility not affecting its public duties; its jurisdiction is limited to matters or controversies wherein the rights of a utility and the public are involved. Its duties begin and end with conservation of the public interest, and are not concerned with individual rights of private litigants; and, ordinarily, it has no power to adjudicate purely private matters between a utility and an individual, or between two utilities, * * *."

In Indianapolis Water Co. v. Schoenemann, 107 Ind.App. 308, 20 N.E.2d 671, 677, it was held that the Public Service Commission had no authority to relieve a utility from liability under the laws of negligence. The court said:

"The Public Service Commission of Indiana is purely an administrative board, created by the State and by legislation is given only administrative and ministerial powers; and is without legislative authority. * * *

"The authority of the Public Service Commission is sufficiently broad to empower it to establish rules and regulations for the government of the utility in the prosecution of its business, but such Public Service Commission cannot relieve a utility from liability under the law of negligence as it exists in Indiana, by any rule it may adopt. If the utility owes a duty to the public under the law, certainly that duty cannot be abrogated or set aside by any regulatory order adopted by the Commission

"'Negligence arises upon the breach of a legal duty to use care, and, where there is no duty, there can be no negligence.'"

In Benwood-McMechen Water Co. v. City of Wheeling, W. Va., 121 W.Va. 373, 4 S.E.2d 300, 303, the court held that:

"The public service commission, under the broad powers given it by the legislature, has the right to pass upon the question of whether or not a pub-

lic utility may enter into a given contract, because of the effect such contract may have upon the power of the utility to carry out its purposes; but when a contract is once entered into, its construction and interpretation, and the rights growing out of the same, including the right to terminate, are to be determined by the courts. 'Power to pass on validity of a private contract or to enforce its provision is intrusted exclusively to the courts.' "

In this connection the question is posed as to whether the matter of dispute between appellant and appellee is of a private nature or a matter of public concern. We believe that this case comes within the rule announced in Central States Power & Light Corp. v. Thompson, 177 Okl. 310, 58 P.2d 868, 870, wherein the court said:

"In the above decision this court held that the Corporation Commission had jurisdiction as to all matters where the public and the utility were involved, but that the Corporation Commission had no power or jurisdiction to adjudicate differences which are purely private between a utility and a citizen. The line of demarcation being that, so long as the matter in controversy is one that affects the public, then the corporation commission would have jurisdiction to consider the same, but where said matter in controversy is a private matter merely between the company and the individual, then the same becomes a private matter between the corporation and the individual and not a public concern, and, not being of public concern, the Corporation Commission does not acquire jurisdiction thereof."

■■ Appellant relies upon paragraphs 2 and 7 of the contract dated September 26, 1952, which provisions of said contract are referred to in the cases as being a hold-harmless agreement. The rule is well established that a provision in a contract seeking to relieve a party to the contract from liability for his own negligence is void and unenforceable, if the provision is violative of law or contrary to some rule of public policy. Under this limitation the courts are in complete accord in holding that a public service corporation, or a public utility such as an electric company, cannot contract against its negligence in the regular course of its business, or in performing one of its duties of public service, or where a public duty is owed, or where a public interest is involved. Oklahoma Natural Gas Co. v. Appel, Okl.1954, 266 P.2d 442; Denver Consol. Electric Co. v. Lawrence, 31 Colo. 301, 73 P. 39; Note, 175 A.L.R. § 23, p. 39 & n. 20.

Collins v. Virginia Power & Electric Co., 204 N.C. 320, 168 S.E. 500, was a case involving a contract between an electric power company and a consumer, which provided that the electric current was sup-

plied on the express agreement that the company should not be liable for damage resulting from condition of wires or appliances to customer, or for any damage by reason of construction, maintenance, or use of intermediate service line from entrance on customer's property to meter, and that the company assumed no obligation for liability on account of any condition on customer's premises or for any defects in customer's wiring or appliances, or for inspection or repairs thereof. The court held that an electric company cannot contract against its negligence when discharging its primary duty to the public, as any other holding would put the individual or corporation using and paying for its power at the mercy of the public service corporation, and held the contract as against public policy to be null and void.

In Corbin on Contracts, Vol. 6, Sec. 1472, p. 869, the rule is stated as follows:

"It is generally held that those who are not engaged in public service may properly bargain against liability for harm caused by their ordinary negligence in performance of contractual duty; but such an exemption is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence. * * *"

Corbin cites Restatement of the Law, Contracts, Sec. 574, pp. 1079–1080, as follows:

"A bargain for exemption from liability for the consequences of negligence not falling greatly below the standard established by law for the protection of others against unreasonable risk of harm, is legal except in the cases stated in Sec. 575."

Section 575 provides:

"Illegal bargains for exemption from liability for wilful or negligent misconduct.

"(1) A bargain for exemption from liability for the consequences of a wilful breach of duty is illegal, and a bargain for exemption from liability for the consequences of negligence is illegal if

*　　*　　*　　*　　*　　*

"(b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation."

Telluride Power Co. v. Williams, 10 Cir., 164 F.2d 685, 687, was an action filed by Williams against the Telluride Power Company to recover damages for the flooding of plaintiff's mine as the alleged result of defendant's negligence in failing to furnish sufficient electric power to operate a pump. Judgment was for plaintiff and defendant

120

appealed. The court held that the power company's change of transformers so as to reduce voltage supplied to the mine, at the mine owner's request and in good faith, was not actionable negligence, but that upon discovery that the voltage was too low to operate the pumps and created danger of flooding, the company was under duty independent of contract to reinstall the old transformers within a reasonable time after request. The court said:

" * * * The company was a public utility engaged in furnishing electric energy to the public, including Williams. One of its duties was to furnish means and facilities reasonably necessary, adequate, and adapted to the accomplishment of that end. The law imposed that duty upon the company, entirely apart from any of its contractual obligations to its consumers of electric energy. * * *"

The rule is stated in 175 A.L.R. Annotation, Limiting Liability For Own Negligence, Sec. 23, p. 39, as follows:

"It appears to be well settled that an electric company cannot validly contract against its liability for negligence since such stipulation would be in contravention of public policy. As stated by the North Carolina Supreme Court: 'Any other holding would put the individual or corporation using and paying for its power at the mercy' of such company."

The rule as to an electric company's degree of care is stated in Caraglio v. Frontier Power Co., 10 Cir., 192 F.2d 175, 177, as follows:

"A power company engaged in distributing electric current over its wires to consumers is not an insurer of the safety of the consumer or anyone else, although the company must exercise a high degree of care to protect those likely to come in contact with its wires. The care required is that commensurate with the dangerous character of the business and consistent with its practical operation, and it extends not only to the erection, maintenance, and operation of the company's plant and apparatus, but also to an inspection thereof and to the discovery of defects. * * *"

This court so held in Mares v. New Mexico Public Service Co., 42 N.M. 473, 82 P.2d 257.

It is true that appellant is not bound to safeguard against occurrences that cannot reasonably be expected as likely to occur. However, appellant had been advised of the condition and had been urged to make an investigation of the services furnished to appellee so as to determine if the energy being delivered was an excessive voltage. Appellee also requested that testing equipment be installed to assist in making such determination and when said test-

ing equipment was installed on January 22, 1957, it was found that certain capacitors were in a defective condition. The measure of care in maintaining appellant's equipment is of a high degree.

Some of the expressions found in the decisions of the care required by electric companies are as follows: "highest degree of care in the maintenance and inspection" (Benton v. North Carolina Public-Service Corp., 165 N.C. 354, 81 S.E. 448, 449); "greatest degree of care and constant vigilance" (Mitchell v. Raleigh Electric Co., 129 N.C. 166, 39 S.E. 801, 802, 55 L.R.A. 398); "highest skill * * * which is attainable, consistent with the practical operation" (Denver Consol. Electric Co. v. Lawrence, 31 Colo. 301, 308, 73 P. 39).

In Denver Consol. Electric Co. v. Lawrence, supra, the court held that an electric company, before sending its current for lighting purposes through the apparatus installed in a building by other parties, is bound, on its own responsibility, to make reasonable inspection of the apparatus to see whether it is fit for use.

In Houston v. Durham Traction Co., 155 N.C. 4, 71 S.E. 21, 23, the court quoted from Memphis Consol. Gas & Electric Co. v. Letson, 6 Cir., 135 F. 969, 68 C.C.A. 453, as follows:

"The contention of the company amounts to this: That if the wires were properly installed it cannot be held responsible for their being out of repair, unless it is proved that they got out of repair through its fault. But this loses sight of the duty of the company, not only to make the wires safe at the start, but to keep them so. They must not only be put in order, but kept in order. The obligation is a continuing one. The safety of patrons and the public permits no intermission. Constant oversight and repair are required and must be furnished."

It has been held that if injury is sustained by reason of an excessive current negligently allowed to pass through the transformer, or otherwise negligently allowed to escape from the primary wires and overcharge the secondary system, the company is liable therefor. Duncan v. Ft. Dodge Gas & Electric Co., 193 Iowa 1127, 188 N.W. 865, 867.

In Virginia Electric & Power Co. v. Carolina Peanut Co., 4 Cir., 186 F.2d 816, 32 A.L.R.2d 234, it was held that the fact that an electric power company supplied current under a tariff approved by the Public Service Commission of the state, did not prevent the company from cutting off current from its lines to avoid a dangerous situation which threatened great loss to one of its customers, and did not relieve the company from liability for fire damage allegedly caused by failure to cut off electric current when advised of a dangerous situation.

■ Applying the principle of law involved, we hold that appellant, Southwestern Public Service Company, cannot validly contract against its liability for negligence in the performance of a duty of public service, since such stipulation would be in contravention of public policy.

■ Turning to the inquiry of whether there is evidence in the record to support the finding of negligence and resulting damage to the electric motors which were burned on January 9 and May 31, 1957, there is evidence in the record that appellee had operated its feed processing mill approximately six years, during which time appellee had experienced some electric trouble and some eight or ten heavy electric motors had been burned out. Appellee had complained to appellant's district manager five or six times about the motors being burned out and had requested the installation of a recording volt meter, which was eventually installed on June 4, 1957. One of appellant's employees, pursuant to appellee's complaints, did make an inspection of appellee's equipment on January 15, 1957. This followed the motor burn-out on January 9, 1957. On January 21, 1957, appellant conducted certain tests at appellee's plant, which determined that there was a current in each of three phases in appellant's transmission line, one of 16 amperes, one of 3 amperes and one of 23 amperes. The test disclosed two bad capacitor units on appellant's line which sometimes may result in a voltage unbalance. This witness testified that he found three volt unbalances in the secondary line, which were responsible for the large variation in the phase currents.

Appellant did not deny that the capacitors were defective and when the damage on the motor was checked it was determined that it was just unbalanced too much, for what the witness figured, was good for the system. This witness testified that a capacitor was an accessory installed in an electric transmission line to accomplish two purposes: (1) to regulate voltage, and (2) to provide even current. There is testimony that a defective capacitor creates unbalance as between the three phases of current and if a motor is operated under an overloaded condition, with these defects present, a heat rise results with immediate danger of damage or destruction to the motor.

Appellant also contends that there is no substantial evidence to support the trial court's findings that the voltage furnished was excessive so as to be unreasonable, even if the measure of the permissible tolerance should be based upon the rating of appellee's 2300 volt motors, rather than the approximate 2400 volts provided for under the contract. There is a conflict in the evidence as to the amount of the variance or reasonable tolerance and appellant argues that its duty was to furnish electrical

energy to meet the manufacturer's voltage specifications within reasonable tolerance of not to exceed 10% above or below such specifications. There is evidence tending to support this contention.

There is also evidence that the manufacturer's recommendation was that the motor not be operated more than 10% of its name plate rated voltage, and that the three motors were 2300 volt motors, and that based on 2680 volts on June 4, 1957, the percentage-wise above the manufacturer's recommended voltage that was going through the motors at that time, was about 16½% above the rated voltage and that said amount is an excessive amount of voltage over and above the maximum tolerance.

There is also evidence that the voltage was not steady and a witness was unable to determine the reasons why there were dips in the recording chart of June 4, 1957.

From the above evidence and other evidence in the record as to the excessively high voltage which was being transmitted, we hold that there is substantial evidence to support the trial court's findings of fact and conclusions of law.

Finding no error in the record, the judgment is affirmed.

It is so ordered.

McGHEE, C. J., and COMPTON, CARMODY, and MOISE, JJ., concur.