2005-NMCA-090

118 P.3d 716

**SUMMIT PROPERTIES, INC.,**
Plaintiff/Appellee/Cross–
Appellant,

v.

**PUBLIC SERVICE COMPANY OF NEW MEXICO,** formerly doing business as Sangre De Cristo Water Company, and now doing business as PNM Water Services, and City of Santa Fe, a municipality, Defendants/Appellants/Cross–Appellees.

No. 24,231.

Court of Appeals of New Mexico.

May 9, 2005.

Certiorari Denied,
No. 29,260, July 15, 2005.

Mark L. Ish, Carol J. Ritchie, Felker, Ish, Ritchie & Greer, P.A., Karl H. Sommer, Sommer, Udall and Hardwick, Bruce C. Throne, Santa Fe, for Appellee/Cross–Appellant.

Jerry Wertheim, Jones Snead Wertheim & Wentworth, Santa Fe, Thomas C. Bird, David W. Peterson, Anastasia S. Stevens, Keleher & McLeod, P.A., Albuquerque, for Appellants/Cross–Appellees.

## OPINION

PICKARD, J.

{1}  Summit Properties (Summit), a real estate developer, sued the Public Service

Company of New Mexico (PNM) and the City of Santa Fe (City) for, among other things, breach of contract and violation of the Unfair Practices Act (UPA). Summit settled its claims against the City. A trial was held on the claims against PNM, which resulted in the jury's awarding damages to Summit. The trial court also entered an order granting PNM an offset against the judgment based on Summit's settlement with the City. PNM appeals, and Summit cross-appeals. We affirm.

## FACTS

{2} PNM owned and operated a water utility in Santa Fe under the name of Sangre de Cristo Water Company (SDCW) (hereinafter we may refer to both entities as PNM). Summit purchased property in the City for development. Before Summit purchased the property, PNM represented to Summit that it planned to expand its water utility system to serve the area where the property was located. After the purchase of the property, PNM withdrew its plan to construct an expansion of its water utility system into the area to be developed. Although Summit was prepared to construct a private water system to serve its 26 lots, the City would approve Summit's development plans only on the condition that PNM's water utility system be expanded to cover Summit's property, as well as other developments in the area. Following discussions between PNM and Summit, PNM agreed to provide water service to the development area based on the terms of a special and unique contract between PNM and Summit under a line extension policy authorized by the New Mexico Public Service Commission (Commission), SDCW "Rule 19." Rule 19 generally sets forth the requirements for line extensions and provides that they are to be paid by the customer to whose property the services are run. Rule 19 also provides that

> [w]here unusual circumstances exist, an extension may be made under a special long-term contract providing the contract terms are such that no adverse affects [sic] will be imposed on Company's existing customers; and further providing any such contracts entered into shall be filed with

[the] New Mexico Public Service Commission.

{3} This special contract between PNM and Summit was filed with the Public Service Commission on October 16, 1990 (1990 Contract). The essence of the contract was that Summit would construct a water system including a 500,000 gallon water storage tank, transmission lines, and a pump station (Facilities) to serve approximately twenty times the number of customers than it originally contemplated for its own development. This expansion system would be designed by PNM and would be transferred to PNM at no cost under the 1990 Contract. Upon this transfer, PNM would collect hook-up fees from the other customers not in Summit's development, which PNM would then pay over to Summit, allowing Summit to recoup the investment not required by its own development.

{4} The financial arrangements by which Summit would recoup its investment in the water system from PNM under the 1990 Contract were contained in what the contract called a "Rebate Provision." The Rebate Provision provided that the Facilities would provide water service in a designated area to 523 single family residences. Third-party users of the Facilities would be allowed to connect to the Facilities by paying "a proportionate share of the cost of the Facilities as a Connection Fee" determined by a specific formula. Additionally, the Rebate Provision provided a method for determining the cost of the Facilities, which cost would be determined at the time the Facilities were transferred to PNM. The Connection Fee was to be collected by PNM "at the time it would normally collect service line extension charges" and would be paid to Summit within thirty days of its receipt by PNM. The 1990 Contract did not set a specific amount for the Connection Fee.

{5} The dispute in this case centered around the elements that should be included in the Facilities Cost pursuant to which the Connection Fee was calculated. Summit and PNM signed a bill of sale establishing a Facilities Cost, following which PNM wrote to the Commission, stating that the Connection Fee would be that amount divided by

523. Summit, on the other hand, claimed that this figure excluded certain costs and that Summit signed the bill of sale under economic coercion because otherwise PNM would not accept the water system Summit had built, leaving Summit with a development without water service. Summit also had a number of related claims about how PNM was charging third parties.

{6} PNM entered into an agreement to sell SDCW, including the Facilities, to the City on February 28, 1994. On February 24, 1994, Summit had entered into a contract with the City for water and sewer service (Water and Sewer Service Agreement). The Water and Sewer Service Agreement recognized that Summit had built the Facilities at its own expense under the 1990 Contract. On July 3, 1995, PNM sold the Facilities to the City. An Operating Agreement was signed which authorized PNM to continue managing and operating the Facilities. The sale was approved by the Commission.

{7} On appeal, PNM claims that (1) the trial court erred in allowing Summit to bring claims arising before the sale of the Facilities to the City because the Commission had exclusive jurisdiction over those claims; (2) Summit's claims under the UPA were barred as a matter of law; and (3) Summit's claims arising after the sale of the Facilities should have been dismissed because PNM's liability was precluded by the doctrines of abandonment, novation, and impracticability/impossibility. In the cross-appeal, Summit challenges the trial court's grant of an offset of the damages award, claiming that PNM was solely liable on certain breach of contract claims, and Summit and the City had expressly agreed that the settlement was for attorney fees and not for damages. Some arguments made by the parties involve legal questions, and some involve factual questions. The parties are not completely in agreement regarding the standard of review. We review questions of law under a de novo standard of review and questions of fact under a substantial evidence standard of review. *See Jicarilla Apache Nation v. Rodarte*, 2004–NMSC–035, ¶ 24, 136 N.M. 630, 103 P.3d 554. As discussed in this opinion, we affirm.

## DISCUSSION
### Jurisdiction

{8} PNM makes two main jurisdictional arguments on appeal. Under the broader argument, PNM claims that, as a matter of New Mexico statutory and common law, the Commission has exclusive jurisdiction over the matters raised in this case, and a breach of contract lawsuit cannot be used to litigate those matters. More narrowly, PNM claims that Summit's attack on the Connection Fees should not have been allowed because those fees amounted to "filed rates," and, under the filed-rate doctrine, a contract or tort lawsuit cannot be used to change a filed rate.

### *Statutory and Common–Law Jurisdiction Arguments*

{9} PNM contends that the Commission has exclusive jurisdiction under our statutes to regulate and supervise rates and service regulations of a public utility. Relying on NMSA 1978, § 62–3–3(H), (J) (2003), PNM argues that the term "rates" is broadly defined to include "every practice, act or requirement 'in any way relating' to charges for utility service," and that the term "service regulations" is even more broadly defined to include "every practice, act or requirement relating to the service or facility of a utility." PNM claims that the Connection Fees that were to be charged under the 1990 Contract were "charges to be imposed upon third parties as a condition to obtaining water service," and are therefore "rates." PNM also claims its "acts and practices in implementing" the 1990 Contract related to "service regulations." Therefore, because the Connection Fees are "rates" and because PNM's acts with regard to the 1990 Contract were "service regulations," PNM concludes that the Commission has exclusive jurisdiction over the 1990 Contract and the Connection Fees.

{10} In addition, relying on New Mexico common law, PNM claims that this case involves a matter in controversy that affects the public and does not involve a purely private dispute. *See Southwestern Pub. Serv. Co. v. Artesia Alfalfa Growers' Ass'n*, 67 N.M. 108, 117–18, 353 P.2d 62, 68–69 (1960) (discussing rule that the power of the

Commission is limited to matters and controversies involving the rights of a utility and the public and does not extend to acts by the utility that do not affect its public duties). PNM claims, in this case, that the matter in controversy—the 1990 Contract—is of public concern because it has to do with Connection Fees that were to be charged in conjunction with the development of 523 residences.

{11}  PNM's argument is far too broad. PNM's position would create a situation where no public utility could be sued for any matter related to its activities. The general rule, however, is to the contrary—that jurisdiction over contract or tort claims made against a public utility usually rests with the courts. *See Nev. Power Co. v. Eighth Judicial Dist. Ct.*, 102 P.3d 578, 586 (Nev.2004); *see also Campbell v. Mountain States Tel. & Tel. Co.*, 120 Ariz. 426, 586 P.2d 987, 990–92 (Ct.App.1978) (discussing the doctrine of primary jurisdiction and the rule that construction of contracts and determination of their validity are judicial functions for the courts); *Ethyl Corp. v. Gulf States Utils., Inc.*, 836 So.2d 172, 176 (La.Ct.App.2002) (noting that courts have no jurisdiction over fixing and regulating rates by utility and commission has no jurisdiction over contract disputes with utility); *State ex rel. GS Techs. Operating Co. v. Pub. Serv. Comm'n*, 116 S.W.3d 680, 696 (Mo.Ct.App.2003) (determining that controversies over contracts are enforceable by courts, not the commission, because courts can enforce contract and enter judgment); *Bell Tel. Co. v. Uni–Lite, Inc.*, 294 Pa.Super. 89, 439 A.2d 763, 765 (1982) (reasoning that claims related to rates and service are within expertise and jurisdiction of commission, but contract disputes are not). In New Mexico, as in most other states, the Commission has no power to award damages where a contract with a utility has been breached. *See Southwestern Pub. Serv. Co.*, 67 N.M. at 117–18, 353 P.2d at 68 (noting that Commission has power to decide whether utility can enter into a given contract, but once entered into, the construction and interpretation of the contract are to be determined by the courts); *see also* NMSA 1978, § 62–6–4 (2003) (discussing powers and duties of the Commission). The only exclusive power given to the Commission is to "regulate and supervise" every public utility. *See* § 62–6–4(A). This does not preempt lawsuits involving contracts a utility enters into with private parties. *See Southwestern Pub. Serv. Co.*, 67 N.M. at 117–18, 353 P.2d at 68.

{12}  The *Nevada Power Co.* case is instructive. In that case, an electric utility was sued for breach of contract, breach of the covenant of good faith and fair dealing, and unfair practices. 102 P.3d at 581. The claims arose out of the placement of meters, which can be placed on the primary side of a transformer before the voltage level of electricity is converted to an amount that can be used by the customer, or on the secondary side of the transformer after the voltage level is converted. *Id.* at 581–82. The meter is typically placed on the secondary side, after the conversion has taken place, in order to avoid charging the customer for the energy that is lost in the conversion process. *Id.* at 582. The utility represented to its customers that it would be to their benefit to place the meters on the primary side of the transformers. *Id.* The plaintiffs claimed that the utility had deceptively advised them that placement of the meters in a particular location would be in their best interest, when, in fact, the placement of the meters allowed the utility to charge a higher rate for the electricity used. *Id.* at 583. The utility claimed that the Nevada Public Utilities Commission had exclusive jurisdiction over the customers' claims because the claims constituted challenges of tariff rates and placement of the meters and, as in New Mexico, the Commission retained exclusive jurisdiction to regulate and supervise public utilities and the setting of rates charged to customers. *Id.* at 584. The Nevada court held that the general rule that the courts have original jurisdiction "over claims sounding in tort, contract, and consumer fraud" applied and that the court had original jurisdiction over the plaintiffs' claims. *Id.* at 586–87. In so holding, the court pointed out that the plaintiffs were not challenging the reasonableness of the rates approved by the Commission. *Id.* at 586. Instead, they were challenging misrepresentations made by the utility that resulted in

certain rates being charged to the plaintiffs. *Id.* at 587.

**{13}** Similarly, in this case, Summit has not challenged the reasonableness of any rates established or approved by the Commission. In fact, as discussed below, the Commission had no role in establishing or approving the Connection Fees. Instead, Summit challenged PNM's failure to carry out its obligations under a contract that was intended to compensate Summit for advancing the costs of the Facilities. Summit claimed, for example, that PNM had incorrectly calculated the cost of the Facilities, had failed to collect certain Connection Fees, and had allowed connections for service from the Facilities by third parties outside the service area. These claims are not related to the reasonableness of any rates established by the Commission. Even though the means chosen to supply the compensation for the costs advanced by Summit were based on Connection Fees to be charged to new third-party customers, the Commission did not therefore obtain exclusive jurisdiction over Summit's claims. *See id.* at 586–87. The dispute between the parties remains a private dispute concerning the construction of the Facilities and compensation due to Summit as a result.

**{14}** As noted above, PNM also maintains that the Commission had exclusive jurisdiction over this dispute because, according to PNM, the dispute was a matter of public concern, rather than simply a private dispute between PNM and Summit. PNM points out that the 1990 Contract for water service affected 523 residences, "or their equivalent." We disagree that the dispute was a matter of public concern. The point of the 1990 Contract was not to establish Connection Fees that were reasonable or fair for the public. Rather, the 1990 Contract established fees that would allow Summit to recover the monies expended to build the Facilities. Although other members of the public might be affected by the collection of the Connection Fees, the dispute in this case is a private one over PNM's actions in executing the terms of the 1990 Contract.

**{15}** In addition, the Commission had no part in establishing the amount of the Con-

nection Fees or in regulating or approving that amount. According to the testimony of Steve Schwebke, an engineering bureau chief who was employed by the Commission, there are no requirements under the line extension policy "for the Commission to approve any of [these] special or specific contracts that might be submitted"; the special contracts are submitted to the Commission "for informational purposes only." Schwebke stated that it was his understanding that "there is no specific authorization or approvals that are implied by the Commission just as a result of the contract being filed." Schwebke also testified that, in his experience, when reviewing a filed contract, such as the one in this case, he would initial the filing to show that he reviewed it and found no particular problem that would require further action by the Commission staff. If a staff member identified a problem when reviewing a special contract, the staff member would likely convert an informal investigation to a formal one by filing a motion to bring the contract to the attention of the Commission. Schwebke testified that the Commission staff is not an official body itself, that an action by the staff does not constitute an official act by the Commission, and that official acts by the Commission would likely be reflected in the form of an order. As established by Schwebke's testimony, the fact that a staff member of the Commission cursorily reviewed the 1990 Contract and found nothing glaringly wrong does not automatically grant the Commission exclusive authority to resolve all disputes arising out of the contract, particularly where the Commission cannot compensate Summit for all of the harm it suffered from PNM's failure to abide by the terms of the 1990 Contract.

*Filed–Rate Doctrine*

**{16}** PNM argues that the main thrust of Summit's lawsuit was to attack the amount of the Connection Fees. PNM claims that Summit asked for damages that included an increase in the Connection Fees. PNM argues that the Connection Fees were "filed rates" and Summit's breach of contract lawsuit cannot be used to change a filed rate. We note that PNM's argument regarding filed rates

affects only those damages awarded that concerned the amount of the Connection Fees and not other damages such as Connection Fees that should have been, but were not, collected from third parties that connected to the Facilities. These other damages are not in any way attacks on the amount of the Connection Fees, and the filed-rate argument is therefore not applicable to them.

{17} A filed rate is one that is approved by the regulatory agency and is "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Valdez v. State*, 2002–NMSC–028, ¶ 5, 132 N.M. 667, 54 P.3d 71 (internal quotation marks and citations omitted). In this connection, PNM claims that mere filing, without positive approval, is sufficient to create a filed rate. However, the authorities cited by PNM do not stand for that proposition. In *Keogh v. Chicago & Northwestern Railway*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), the rates were "published," had been challenged in hearings before the commission, and had not gone into effect until the commission approved them. *Id.* at 161, 163, 43 S.Ct. 47. In *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the rates were filed with the commission and "allowed to go into effect" by the commission. *Id.* at 417, 106 S.Ct. 1922. Here, the Commission played no role in setting or approving the Connection Fees. PNM has pointed to no evidence in the record showing that the Commission had the power to approve or disapprove of the amount of the Connection Fees.

{18} The purposes behind the filed-rate doctrine are to prevent price discrimination by requiring similarly situated customers to pay the same rates for service, to preserve the role of regulatory agencies in approving rates, and to keep courts out of rate-making. *Valdez*, 2002–NMSC–028, ¶ 5, 132 N.M. 667, 54 P.3d 71. PNM claims that the Connection Fee referred to in the 1990 Contract qualifies as a filed rate because the Commission received, reviewed, and approved the 1990 Contract entered into pursuant to Rule 19, and the Facilities' Cost and Connection Fee were reported to the Commission by a letter on August 18, 1994. According to PNM, the letter and the filing of the 1990 Contract provided the Commission with "all of the information required to judge the reasonableness of the Connection Fee" and the Commission did not disapprove of the Connection Fee.

{19} As discussed above, the testimony by Schwebke demonstrated that the Commission did not give its approval of the 1990 Contract. Instead, a member of the Commission staff merely reviewed the 1990 Contract for glaring problems. The 1994 letter sent to the Commission provided notice that the Facilities were completed, indicated that PNM believed that the Connection Fee should be in the amount of $2,013.08, and alleged that the 1990 Contract was "one of the specific contracts" being assumed by the City as part of the sale of the Facilities. There is nothing to indicate that the Commission reviewed or approved the letter or its contents. In particular, there is nothing to indicate that the Commission approved of the specific amount to be rebated to Summit in the form of Connection Fees. Without approval by the Commission, the Connection Fees cannot be categorized as "filed rates." Therefore, the filed-rate doctrine does not apply to this case.

{20} The Connection Fees under the 1990 Contract were set not for public benefit, but for the private benefit to Summit in rebating its costs for the Facilities. PNM, in breaching the contract, prevented Summit from recovering its costs. The 1990 Contract involves matters of private concern between Summit and PNM, and therefore the Commission does not have exclusive jurisdiction over the matter.

{21} PNM, in passing, states that where "the Commission has exclusive jurisdiction, a plaintiff must exhaust his administrative remedies, even when the plaintiff seeks damages." Exhaustion of remedies concerns the "timing of judicial review" of an administrative action and applies only in situations where "an administrative agency has original jurisdiction." *See Nevada Power Co.*, 102 P.3d at 586 (internal quotation marks and citations omitted). As discussed above, the Commission did not have original

jurisdiction over Summit's claims. Therefore, the exhaustion of remedies doctrine does not apply to this case.

{22} Finally, PNM argues that Summit attempted to have the jury enforce PNM's utility obligations, enforceable only by the Commission, by asking the jury during closing argument to "make [PNM] live up to the standard of fair, just and reasonable." However, Summit used these words in closing, not to ask the jury to approve what it thought to be fair, just, and reasonable rates, but instead to rebut what PNM's witnesses appeared to contend, which was that PNM engaged in the conduct complained of because of its perceived obligation to be fair, just, and reasonable. Summit's closing argument does not demonstrate to us that it was doing anything other than seeking to enforce a private obligation.

**Post–Sale Contract Defenses**

{23} PNM argues that claims based on its post-sale conduct were barred, as a matter of law, under theories of abandonment, novation, and impracticability/impossibility.

*Abandonment*

{24} PNM sold the Facilities to the City after obtaining approval from the Commission for the sale. PNM contends that the Commission's approval was also for PNM's abandonment of the water utility, "including the utility services addressed" in the 1990 Contract. PNM also contends that Summit expressly consented to its abandonment of utility services. In other words, PNM claims that Summit and the Commission, by agreeing to the sale of the Facilities, also agreed to the abandonment by PNM of its 1990 Contract with Summit. The abandonment issue was submitted to the jury, and PNM is therefore, by necessity, arguing that there was abandonment in this case as a matter of law.

{25} A contract is abandoned "where the acts of one party inconsistent with its existence are acquiesced in by the other party." *See Keeth Gas Co. v. Jackson Creek Cattle Co.*, 91 N.M. 87, 91, 570 P.2d 918, 922 (1977); *see also Lansdale v. Geer-*

*lings,* 523 P.2d 133, 136 (Colo.Ct.App.1974) (stating that a contract may be abandoned if the act or conduct of the parties is inconsistent with the "continued existence of the contract, and mutual assent to abandon a contract may be inferred from the attendant circumstances and conduct of the parties"). Abandonment of a contract involves questions of fact to be determined from the particular circumstances. *Keeth,* 91 N.M. at 91, 570 P.2d at 922. As Summit points out, none of the documents created in connection with the sale of the Facilities contained any mention of any party's intentions regarding continued enforcement of the 1990 Contract. There is no evidence that PNM asked to be relieved of its obligations under the 1990 Contract or that Summit consented to such a request. In fact, Summit continued to negotiate with PNM concerning the execution of the Rebate Provision of the 1990 Contract long after PNM and the City had executed the sale agreement.

{26} PNM's only argument is, in essence, that Summit's agreement not to contest the sale to the City must constitute abandonment as a matter of law. We disagree; at most, this evidence raised a factual issue concerning abandonment, which was properly submitted to, and rejected by, the jury.

{27} PNM attempts to bolster its abandonment and as-a-matter-of-law arguments by pointing out that the Commission approved the sale. By doing so, PNM argues that the Commission essentially approved abandonment of the 1990 Contract as well. Furthermore, PNM argues that the Commission had the power to set aside the Rebate Provision. Although PNM entitles this theory "regulatory abandonment," it is not really an "abandonment" proposition, since it does not rely on abandonment by Summit, the other party to the 1990 Contract. Instead, PNM appears to be arguing that the Commission's actions terminated PNM's obligations under the 1990 Contract as a matter of law, no matter what Summit's intentions toward the Contract might have been. One problem with this argument is that PNM has pointed to no evidence that the Commission even considered the 1990 Contract when it approved the sale from PNM to the City. As

discussed above, PNM did not request permission to do anything with respect to its obligations under the 1990 Contract. PNM can only argue, therefore, that the Commission implicitly approved of its abandonment of the 1990 Contract by approving of the termination of PNM's status as a utility. Because there is no evidence that the 1990 Contract was before the Commission in any way, we cannot agree with this proposition.

*Novation*

■ {28} PNM claims that its obligations under the 1990 Contract were discharged through novation. PNM's only argument is that, as a matter of law, the 1994 Water and Sewer Service Agreement between the City and Summit was to be substituted for the 1990 Contract between PNM and Summit. In other words, PNM claims that, as a matter of law, the City was substituted as obligor under the 1990 Contract when the Facilities were sold. Contrary to PNM's argument, the trial court ruled that, as a matter of law, the 1994 agreement was not a novation or agreement to substitute the City for PNM under the 1990 Contract.

■ {29} Novation requires "(1) an existing and valid contract, (2) an agreement to the new contract by all parties, (3) a new valid contract, and (4) an extinguishment of the old contract by the new one." *Sims v. Craig,* 96 N.M. 33, 35, 627 P.2d 875, 877 (1981). For a novation, "there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well-settled principle that novation is never to be presumed." *Id.* (internal quotation marks and citation omitted). As argued by Summit, PNM was not a party to the 1994 agreement, and Summit was not a party to PNM's sale of the Facilities to the City. In addition, the 1994 Water and Sewer Service Agreement includes no language regarding "extinguishment" of the 1990 Contract, and there is no language in the sale agreement between PNM and the City regarding "extinguishment" of the 1990 Contract. In sum, there is nothing that would show a "clear and definite intention" by all parties, and in particular by Summit, that the purpose of the 1994 Water and

Sewer Service Agreement was to replace the 1990 Contract, including all of PNM's obligations under the 1990 Contract. Therefore, while there was an existing and valid contract (the 1990 Contract), and a new valid contract (the 1994 Water and Sewer Service Agreement), there was no agreement to a new contract by all parties, and there was no extinguishment of the old contract by the new one. The 1994 Water and Sewer Service Agreement, standing alone, does not qualify as a novation of the 1990 Contract.

■ {30} In its reply brief, PNM appears to claim that, at a minimum, there is an issue of fact about whether there was a novation, and the issue should have been submitted to the jury. PNM did not make this argument in the brief-in-chief, despite its protestations to the contrary. Instead, PNM's only argument, made in a footnote, was that its impracticability defense should have been submitted to the jury. PNM did not assert that the novation defense should also have been submitted to the jury. PNM's cursory statement in the footnote that an instruction given by the trial court "negat[ed] jury consideration of PNM's affirmative defenses" is not sufficient to raise the argument that the jury should have been instructed on the defense of novation. Since this argument was made for the first time in the reply brief, we will not consider it. *See State v. Castillo–Sanchez,* 1999–NMCA–085, ¶ 20, 127 N.M. 540, 984 P.2d 787.

{31} Moreover, even if the argument had been preserved, PNM has failed to demonstrate that there was a factual issue allowing the novation defense to be presented to the jury. The 1994 Water and Sewer Service Agreement does not raise an issue of fact about novation because it does not meet the requirements for a novation. Similarly, Summit's agreement not to contest the sale of SDCW to the City, with no evidence of Summit's intentions concerning the 1990 Contract, does not raise an issue of fact as to novation. PNM has pointed to no other evidence that might have supported a finding of a "clear and definite intention" by all parties to substitute the 1994 Water and Sewer Service Agreement for the 1990 Contract.

Therefore, the trial court correctly refused to submit this issue to the jury.

*Impracticability/Impossibility*

{32} The trial court found that, as a matter of law, it was not impracticable or impossible for PNM to comply with the terms of the 1990 Contract after the Facilities were sold to the City. The doctrine of impracticability, which is sometimes referred to as impossibility, applies in situations where performance by a party "is made impracticable without his fault by the occurrence of an event[,] the non-occurrence of which was a basic assumption on which the contract was made." *In re Estate of Duncan*, 2002–NMCA–069, ¶ 27, 132 N.M. 426, 50 P.3d 175 (quoting Restatement (Second) of Contracts § 261 (1979)), *rev'd on other grounds by Estate of Duncan v. Kinsolving*, 2003–NMSC–013, 133 N.M. 821, 70 P.3d 1260. In order for PNM to assert this defense, the condition creating the impossibility must have arisen through no fault of PNM. *See Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d Cir.1975) (noting that party pleading defense of impossibility must show that "it took virtually every action within its powers to perform its duties under the contract"); *see also* Restatement (Second) of Contracts § 261 (1981). An impracticability defense requires a showing by PNM that (1) a supervening event made performance on the contract impracticable, (2) the non-occurrence of the event was a basic assumption on which the contract was based, (3) the occurrence of the event was not PNM's fault, and (4) PNM did not assume the risk of the occurrence. *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294–95 (Fed. Cir.2002); *see also Bradford Dyeing Ass'n, Inc. v. J. Stog Tech GMBH*, 765 A.2d 1226, 1238 (R.I.2001) (stating that one cannot create an impossibility preventing performance on a contract and then be shielded from obligations under the contract "by hiding behind that self[-]created 'impossibility' defense").

{33} In this case, the undisputed fact is that PNM voluntarily agreed to the sale of SDCW and the Facilities to the City. The Agreement to Purchase and Sell SDCW and the Facilities was between the City and PNM, and no other party. PNM argues that it was not at fault for "causing a regulatory order" to be entered. However, PNM agreed to the sale and, based on its own duties as a utility, sought authorization for the sale from the Commission, obtaining an order allowing it to go forward with the sale and with its plan to discontinue its utility status. These actions were initiated by PNM and not by the Commission or Summit. PNM entered into a contract with Summit, a private entity, to have the Facilities constructed and then entered into an agreement with the City to sell the Facilities. PNM cannot create the impossibility of performing under the contract with Summit by entering into an agreement with the City to sell the Facilities and then hide behind the impossibility that it helped create. The trial court correctly determined that the impossibility defense was not available to PNM as a matter of law.

{34} To the extent that PNM contends that the jury should have been instructed on the impossibility defense, there were no factual issues for the jury to decide. The evidence was undisputed that PNM procured the regulatory ruling that it contends created the impossibility. As discussed above, the defense of impracticability/impossibility is not available under those circumstances. *See Thompson Drilling, Inc. v. Romig*, 105 N.M. 701, 705, 736 P.2d 979, 983 (1987) (holding that a party is entitled to have a jury instructed on a legal theory if the theory is supported by the evidence).

{35} In one sentence, PNM argues that the fact that it procured the approval of the Commission to abandon its status as a utility cannot be used to deny PNM the defense of impracticability, because to do so would violate PNM's constitutional right to petition the government. We do not address this argument because it has not been developed sufficiently to allow us to consider it. A citation to two cases, *United Mine Workers v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), both general-

ly exempting from the anti-trust act concerted action seeking to influence public officials, without any explanation of how those cases support PNM's position, is not sufficient to obtain a ruling from this Court on a constitutional claim such as the one PNM apparently raises.

{36} PNM also contends that the impossibility was created with Summit's acquiescence because Summit agreed not to challenge the sale of SDCW to the City. PNM has cited no authority for the proposition that a self-created impossibility can still be a defense to a contract action if the other party to the contract acquiesced in the creation of the impossibility. *See Wilburn v. Stewart*, 110 N.M. 268, 272, 794 P.2d 1197, 1201 (1990) ("Issues raised in appellate briefs that are unsupported by cited authority will not be reviewed ... on appeal."). Although we need not consider this contention, as it is not supported by any authority, we note that Summit's acquiescence in the sale appears to be relevant only to PNM's other defenses, such as the abandonment defense that was submitted to the jury. It does not seem correct that a party to a contract would be absolved of its role in creating an impossibility simply because the other party to the contract did not object to the action creating the claimed impossibility.

{37} Due to our decision on this argument, we need not address Summit's contention that PNM remained in charge of operating SDCW as an independent contractor after the sale. Summit contends that PNM therefore retained the ability to carry out the terms of the 1990 Contract. PNM, on the other hand, claims that it had no authority or responsibility toward Summit after the sale because PNM was only an agent at that point. While we do not resolve this issue, we note that PNM provided no facts concerning its powers or duties as operator of SDCW following the sale. It may be true, therefore, that PNM had the necessary authority to carry out the duties required by its pre-existing contract with Summit.

### Post–Sale UPA Claims

{38} Prior to trial, the trial court granted PNM's motions for summary judgment in part, dismissing the UPA claims to the extent that the claims were "based on conduct occurring before July 3, 1995." The trial court believed that the Commission's adoption of Rule 19, the provisions of the 1990 Contract under Rule 19(G), and review of the 1990 Contract by the Commission staff constituted "sufficient active supervision to meet the standards required under Section" 57–12–7. NMSA 1978, § 57–12–7 (1999) states that the UPA shall not apply to actions or transactions expressly permitted under laws administered by a regulatory body. With respect to claims based on actions occurring after July 3, 1995, the trial court stated that it was PNM's burden to "affirmatively establish that the active supervision continued after the City took over direction of the water company." The trial court found that the undisputed facts did not support a conclusion that "such active supervision exists." Based on its findings, the trial court denied summary judgment with respect to claims arising after July 3, 1995 (post-sale). We do not comment on the correctness of the trial court's ruling that the pre-July 3, 1995 (pre-sale), actions were exempt.

{39} On appeal, PNM argues that the trial court erred in allowing the post-sale claims to go to the jury. PNM makes two major arguments regarding the UPA claims. First, PNM states that the UPA claims were based on "the very same actions and representations made before that date, and the district court determined that those actions or transactions were exempt" under the UPA. Second, PNM contends that, since its actions before and after the sale of the Facilities had not changed, the finding that its pre-sale actions were exempt would, as a matter of law, apply also to its post-sale actions even though the Commission no longer had authority to supervise PNM's actions with respect to the Facilities.

{40} Summit argues that these arguments were not made below and therefore were not preserved for appeal. Summit contends that PNM instead argued only that the City regulated the Facilities after the sale, and the City's regulation was sufficient to entitle PNM to the UPA exemption contained in Section 57–12–7. In response,

PNM claims that it did make this argument below and provides various cites to the record proper and transcripts in support of that assertion. We have reviewed those citations and find they do not support PNM's claim that this argument was preserved. The only arguments made in the portions of the record and transcript cited by PNM are as follows: (1) no misrepresentation made by PNM after the sale was a proximate cause of any of Summit's damages; (2) PNM did not make any false or misleading statements because PNM continued to do the same acts after the sale as it had before the sale; and (3) any statements made by PNM, that are the subject of Summit's UPA claims, were made before the sale when PNM enjoyed immunity under Section 57–12–7. These arguments are not the same as the argument PNM makes now on appeal—that its conduct after the sale is exempt because it is the same conduct it engaged in before the sale. The arguments made by PNM below did not fairly invoke a ruling from the trial court on the "continued exemption" theory now advanced by PNM, and this new theory was therefore not preserved for appeal. *See Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987).

{41} Even if PNM had properly preserved its "continued exemption" argument, we would find that argument to be without merit. First, to the extent that PNM is arguing that approval and supervision by the Commission of its pre-sale actions extended to its post-sale actions, we point out that the statute requires that the actions be expressly permitted by a regulatory body. What is important therefore is whether PNM's actions after the sale were expressly permitted. *See* § 57–12–7. Even if we accept PNM's claim that the Commission's "approval" carried over to its post-sale actions, those actions could not have been expressly permitted by the Commission because, after the sale, the Commission no longer had the authority to supervise actions connected to the Facilities.

{42} Second, PNM argues that the claims made by Summit involve "alternative interpretations of uncertain contract terms," which are not actionable under the UPA.

PNM claims that it merely had a different interpretation than Summit of an ambiguous contract, and therefore, as a matter of law, any dispute about the contract terms cannot be the basis for a claim under the UPA. PNM concedes that the trial court correctly instructed the jury that no violation of the UPA would result if PNM gave "its interpretation of terms of the 1990 Agreement for which Summit has asserted a different interpretation or for PNM to perform the Agreement in accordance with its interpretation provided its interpretation is reasonable." The jury was therefore given an opportunity to decide whether PNM's interpretation of the 1990 Contract was reasonable and decided that it was not.

{43} In order to avoid that decision, PNM contends in effect that its interpretation of the 1990 Contract was reasonable as a matter of law. PNM's argument is as follows: (1) The trial court found that PNM's actions with respect to the 1990 Contract before the sale were approved by the Commission; (2) PNM and the City continued to act in exactly the same manner after the sale; and (3) therefore, the prior approval by the Commission makes PNM's and the City's post-sale conduct reasonable as a matter of law, even if PNM's interpretation might have been a mistaken interpretation of the 1990 Contract. However, the trial court's ruling was not that the Commission approved everything PNM did in carrying out its obligations under the 1990 Contract. The trial court's ruling was clearly directed only at the Commission's approval, allowing utilities to enter into special contracts under Rule 19 concerning line extensions, as well as the "approval" of the 1990 Contract itself by the Commission. The trial court never found that the Commission approved of all the conduct PNM engaged in while executing its duties under the 1990 Contract. In addition, there were different allegations of pre-sale and post-sale conduct. The trial court's ruling therefore does not support PNM's claim that its actions were reasonable as a matter of law. Accordingly, the reasonableness of PNM's actions was a factual issue for the jury to resolve.

### Offset of Settlement Amount

{44} Summit and the City reached a settlement on the breach of contract claim against the City. In exchange for $100,000, Summit released the City from all claims arising to the date of the settlement agreement. Summit claims that, as part of the settlement agreement, the parties expressly agreed that this sum was not attributable to any of the actual damages allegedly caused by the City's breach of contract, but rather that the settlement payment was for legal fees Summit incurred litigating its claims against the City. After the jury awarded damages against PNM, PNM moved to have the damages amount offset by the $100,000 settlement amount. The trial court granted the motion, and Summit appeals that decision. Summit makes three arguments with respect to the order allowing the offset: (1) the settlement funds are from a collateral source from which PNM cannot benefit, (2) the settlement funds do not represent a duplicative recovery, and (3) the City and Summit agreed that the settlement was for attorney fees incurred in litigating claims against the City and not to cover damages for any breach of contract by the City.

### *Collateral Source*

{45} Summit contends that the settlement is from a collateral source and cannot be used to offset the damages award against PNM. As asserted by Summit, *McConal Aviation, Inc. v. Commercial Aviation Insurance Co.*, 110 N.M. 697, 799 P.2d 133 (1990) (*McConal*), states that the general rule is that a plaintiff may not recover more than his or her actual loss. *Id.* at 700, 799 P.2d at 136. An exception to that general rule is the collateral source rule, which provides that a plaintiff may recover his or her "full losses from the responsible defendant, even though he may have recovered part of his losses from a collateral source." *Id. McConal* involved a plaintiff who sued an insurance company, agent, and broker for damages based on the insurance company's failure to issue an insurance policy. *Id.* at 698, 799 P.2d at 134. The plaintiff sued the broker for negligence and the insurance company for breach of contract, the broker set-

tled with the plaintiff prior to trial, and the plaintiff was awarded damages at trial based on the breach of contract claim against the insurance company. *Id.* The Supreme Court held that an offset of the settlement amount should not be applied toward the damage award. *Id.* at 700, 799 P.2d at 136. Summit claims that this case is like *McConal.*

{46} We disagree. As pointed out by PNM, *McConal* was later limited by the decision in *Sanchez v. Clayton*, 117 N.M. 761, 765, 877 P.2d 567, 571 (1994), to situations where there are no facts showing that the parties were jointly liable for the damages caused to the plaintiff. In addition, as pointed out by PNM, Restatement (Second) of Contracts § 294(3) (1981), provides that payments from a joint obligor on a contract are credited toward the amount received from other joint obligors. This principle is based on the idea that a contracting party is not entitled to double recovery. *See, e.g., Evanow v. M/V Neptune*, 163 F.3d 1108, 1119 (9th Cir.1998) (noting that the rule under the Restatement of Contracts is "simply a manifestation of the rule that a contracting party should not receive more than was bargained for"). "New Mexico does not allow duplication of damages or double recovery for injuries received." *Hale v. Basin Motor Co.*, 110 N.M. 314, 320, 795 P.2d 1006, 1012 (1990). Here, the trial court found that PNM and the City were jointly liable under the 1990 Contract after the sale in July 1995. It appears that the finding was, in part, based on Summit's argument. Summit does not challenge that finding. Therefore, there is no dispute that PNM and the City were joint obligors for damages arising after the sale of SDCW and the Facilities. Based on this, we conclude that the settlement payment cannot be considered to be from a collateral source.

### *Duplication of Damages*

{47} Summit claims that PNM failed to show that the settlement amount was a duplication of damages that Summit was awarded, or that the settlement amount, along with the damage award, was more than the total amount of damages suffered by Summit. Summit claims that there was a period of time when PNM was solely liable for the

damages to Summit, that the joint liability of PNM and the City did not begin until after the sale, and that for a portion of that time PNM was necessarily solely liable because the City was successful in asserting a statute of limitations defense. Summit cites no authority for the proposition that a finding of joint and several liability is legally changed to sole liability where one of the joint obligors is successful in asserting a statute of limitations defense. *See Wilburn,* 110 N.M. at 272, 794 P.2d at 1201 ("Issues raised in appellate briefs that are unsupported by cited authority will not be reviewed ... on appeal."). Moreover, this argument was not raised in the trial court. *See Woolwine,* 106 N.M. at 496, 745 P.2d at 721.

{48} On the merits of this issue, in this case, the jury was not asked to separate the damages and award damages only for the pre-sale period of time or only for the period of time between the sale and December 11, 1997, when the statute of limitations defense no longer applied. The jury's damage award, therefore, was a comprehensive award that included both pre-sale and post-sale damages, and the award was intended to compensate Summit for all of the damages it suffered as a result of conduct by PNM and the City. Therefore, the settlement amount was in addition to all of the damages suffered by Summit and was duplicative of a portion of those damages.

{49} We also disagree with Summit's argument that it requested a higher amount of damages than the jury awarded, and therefore the payment by the City could be attributed to the amount of damages the jury refused to award. The flaw in this argument is obvious: the jury was asked to determine the total amount of damages suffered by Summit and found that the amount was lower than the amount Summit claimed. The jury's determination of damages is the measure of the true amount of damages suffered by Summit. Therefore, the payment by the City cannot be considered "compensation" for damages that, according to the jury, Summit did not in fact incur.

*Express Agreement in Settlement*

{50} Summit argues that when it entered into the settlement agreement with the City, the parties expressly agreed that the settlement was for legal fees incurred by Summit in its suit against the City. Summit cites to no statutory or contractual authority giving Summit a legal right to recover such attorney fees from the City. In the absence of such statutory or contractual authority, a party to a lawsuit is not entitled to recover attorney fees from an opposing party. *See N.M. Right to Choose/NARAL v. Johnson,* 1999–NMSC–028, ¶ 9, 127 N.M. 654, 986 P.2d 450 (reiterating that New Mexico follows American Rule that absent statutory or other legal authority, parties are responsible for their own attorney fees). The agreement between Summit and the City, therefore, provided compensation to Summit that it was not otherwise entitled to receive. As provided in Restatement (Second) of Contracts § 294(3), where a joint obligor provides consideration to a plaintiff, that consideration must be credited against the obligation of other joint obligors, and any agreement to the contrary is of no effect. The agreement between. the City and Summit to characterize the settlement as payment for attorney fees, where there was no legal right to those fees, appears to be an effort to circumvent this rule. Under the Restatement, such agreements should not be given effect. *See id.* In addition, allowing Summit to avoid crediting a joint obligor for the amount of the settlement by characterizing the settlement as attorney fees Summit was not entitled to recover in the lawsuit for breach of contract would violate the rule against double recovery of damages and the principles underlying the theory of joint obligations. *See, e.g., Hood v. Fulkerson,* 102 N.M. 677, 680, 699 P.2d 608, 611 (1985) ("Duplication of damages or double recovery for injuries received is not permissible."); *Washington v. Atchison, Topeka & Santa Fe Ry.,* 114 N.M. 56, 58, 834 P.2d 433, 435 (Ct.App. 1992) (stating that function of offset is to achieve equity and justice and that fundamental fairness does not permit double recovery).

{51} Summit claims that reliance on Restatement (Second) of Contracts

**224**

§ 294(3), would ignore precedent that encourages courts to consider the intent of the parties when deciding whether a "non-settling, co-defendant has been released." Summit points to three cases as precedent. *See McConal,* 110 N.M. at 700, 799 P.2d at 136; *Gallegos v. Citizens Ins. Agency,* 108 N.M. 722, 779 P.2d 99 (1989); *Johnson v. Aztec Well Servicing Co.,* 117 N.M. 697, 875 P.2d 1128 (Ct.App.1994). As we noted above, *McConal* was limited by *Sanchez* to situations, unlike the one in this case, where there are no facts showing that the parties were jointly liable for the damages. *Sanchez,* 117 N.M. at 765, 877 P.2d at 571. To the extent that the decisions in *Gallegos* and *Johnson* stand for the proposition that courts must decide whether a party has been released by settlement by looking at the intent of the parties and whether an injured party has been fully compensated, we agree. *See Gallegos,* 108 N.M. at 730, 779 P.2d at 107; *Johnson,* 117 N.M. at 701, 875 P.2d at 1132. However, the intent of the parties cannot override principles against double recovery in the context of joint obligors. As discussed above, characterizing the settlement as attorney fees when Summit had no legal right to those fees appears to be an attempt to evade those principles. Furthermore, both *Gallegos* and *Johnson* require a court to examine whether the injured party has been fully compensated. *Gallegos,* 108 N.M. at 730, 779 P.2d at 107; *Johnson,* 117 N.M. at 701, 875 P.2d at 1132. In this case, the judgment against PNM fully compensated Summit for all damages found by the jury, and the payment by the City to Summit was purportedly for damages Summit was not entitled to recover. Therefore, allowing the offset in this case is consistent with both of these cases.

**CONCLUSION**

{52} Based on the foregoing, we affirm on all issues raised in the appeal and the cross-appeal.

{53} **IT IS SO ORDERED.**

FRY and KENNEDY, JJ., concur.